**AERON MARINE SHIPPING COMPANY**

and

**American Maritime Transport Inc., et al, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Nos. 106–85C, 90–3988C.

United States Claims Court.

Aug. 13, 1992.

Mark P. Schlefer and T.S.L. Perlman, Washington, D.C., for plaintiffs.

Deborah A. Bynum, Washington, D.C., with whom were Asst. Atty. Gen. Stuart M. Gerson, and Director David M. Cohen, for defendant. Christopher A. Muessel, Office of Counsel, Maritime Admin., of counsel.

## OPINION

LYDON, Senior Judge:

Plaintiffs, shipping companies, seek to recover fuel cost subsidies, under operating differential subsidy contracts they entered into with the Maritime Administration, De-

partment of Transportation (MarAd). Plaintiffs claim they are entitled to receive these subsidies under the Merchant Marine Act of 1936, as amended, 46 U.S.C.App. § 1173(b) (1970) (amended 1981). The litigation comes before the court on motions for summary judgment wherein plaintiffs challenge determinations by the Maritime Subsidy Board (Board) of the MarAd that they were not entitled to fuel cost subsidies on the facts before it. Defendant supports the correctness of the Board's determinations. Following consideration of the Board decision, the administrative record, the submissions of the parties and oral argument, the court concludes that plaintiffs are not entitled to recover.

## BACKGROUND STATEMENT

The complaint in docket No. 106–85C was filed on February 21, 1985, in the United States Claims Court. It was remanded to the Maritime Subsidy Board (MSB) by the court on June 27, 1986. *See Aeron Marine Shipping Co. v. United States*, 10 Cl.Ct. 236 (1986). The case was reinstated, following a decision by the MSB, on the docket of the court on November 1, 1990. The complaint in docket No. 90–3988C was filed in the Claims Court on December 5, 1990. The decision of the MSB, referred to above, also considered and rendered a decision on the matters which are the subject matter of the complaint in docket No. 90–3988C. Accordingly, both dockets were consolidated for purposes of further proceedings in the two cases on December 14, 1990.

Extensive administrative proceedings, including a hearing, took place as a result of plaintiffs' applications to the MSB seeking review of an Administrative Law Judge's determination and readjustment of their operating differential subsidy agreements. A large administrative record was developed. The claim period before the Board was 1973–1987. As an initial matter in the litigation process, the MSB was ordered to assemble and certify the administrative record. On or about February 4, 1991, it was ascertained that the MSB had lost the administrative "docket" and that it was in the process of attempting to reconstruct the docket by copying and collating documents in an effort to assemble the record. Both plaintiffs and defendant assisted in this reconstruction effort. Plaintiffs provided defendant with a list of the items they believed should be included in the reconstructed record.

A reconstructed record was assembled and certified by the Secretary of the Maritime Administration. This certified record was thereafter filed with the court. Both parties have accepted this certified record as sufficiently accurate and reliable for the court to address the issues and contentions advanced by the parties. Plaintiffs advise in their brief that they "do not contest the contents of the record" but are concerned with "whether the agency's deliberative procedure accorded with legal requirements."

## FACTS

In its prior decision in this case, the court set out in detail the background and a fact statement necessary to place this litigation in perspective. *See Aeron Marine*, 10 Cl. Ct. at 238–44. This background and fact statement is incorporated by reference and will be repeated herein only in those instances where it is deemed necessary to do so for purposes of the issues now before the court.

Until 1970, construction-differential subsidies and operating-differential subsidies under the Merchant Marine Act of 1936, 49 Stat. 1985 (pertinent current version at 46 U.S.C.App. §§ 1101–1295a (1988) (the Act)), were available for liners only, not for bulk carriers. In 1970, the Act was amended to authorize construction-differential and operating-differential subsidies for bulk cargo vessels in order to reinvigorate the dwindling American Merchant Marine by the construction of 300 subsidized vessels.

The Act, as amended, required that vessels for which subsidies are paid be built in the United States. To optimize the returns in new construction from the construction-differential subsidy, the 1970 amendments provided for reduction of the maximum construction-differential subsidy rate,

which had been fifty-five percent, to forty-five percent in 1971 and thereafter by two points per annum to thirty-five percent. To enable vessels to be built at the costs indicated by those new rates it was necessary to bring about economies in shipbuilding by having ships built to standard designs.

The Maritime Administration (MarAd) contracted with groups of builders, designers, and operators headed by shipyards to develop such designs. These studies produced standard configurations, powering, and other characteristics. All the vessel designs considered by the above groups provided for steam turbine power plants. The design of the vessels in suit was not a MARAD design. At this time, foreign construction of new vessels of similar size (40,000 to 125,000 deadweight tons (d.w.t.)) utilized prevalently internal combustion (diesel) engines. From 1974 on, outside the United States, the overwhelming majority of constructed tankers of sizes in the range 85,000–95,000 d.w.t. and 37,000–41,000 d.w.t. were motor-propelled and diesel powered. Motor-propelled ships especially those with "slow-speed" engines, were known to be more fuel-efficient than steam powered ships. However, the Act required components of subsidized construction to be manufactured in the United States. Since slow-speed diesel engines of suitable size were not being manufactured in the United States, the standard designs then being considered could not provide diesel engines. Further, owing to the unfamiliarity of American builders, repair yards, and crews with vessel diesel engineering, it would have been deemed risky for American owners at that time to specify diesel power for ships to be built in the United States and operated under the American flag.

Early in 1971, MarAd encouraged American shipowners to invest in the subsidized building and operation of American-flag bulk carriers, pointing out that investors would have parity with foreign ships in construction costs through the construction-differential subsidy, parity in operating costs through the operating-differential subsidy, and highly leveraged financing through government guaranties of loans.

Thereafter, various investors applied for subsidies directed at bulk cargo transportation.

Fourteen vessels, the focal point of this litigation, owned by at least seven shipping companies, participated in the bulk cargo vessel subsidy program authorized by the 1970 amendments to the Act. These vessels were built under construction contracts entered into at various times between June 30, 1971 and December 17, 1973. Construction-differential and operating-differential subsidy contracts were entered into by the owners of said vessels with MarAd at various times during the above stated time frame. The operating-differential subsidy contracts or agreements generally were for twenty-year periods. The owners of the vessels in turn executed time charters with several contractors, who were to operate said vessels, at various periods during the time frame identified above. *See Aeron Marine,* 10 Cl.Ct. at 240–41, for a short description of nine of the fourteen vessels. Five vessels (Coronado, Cherry Valley, Chelsea, Chestnut Hill and Kittanning) were not before the court when its first decision in this case was rendered.

The operating-differential subsidy agreements (ODSA) covering the vessels in issue provided for a subsidy on wages, insurance, maintenance, and repairs. In setting forth these items as eligible for subsidy consideration, the Secretary of Transportation (formerly the Secretary of Commerce) made a determination that such a subsidy regarding the above listed items might be necessary in order to meet the competition of foreign-flag ships. *See* 46 U.S.C.App. § 1172 (1970) (amended 1981). The operating-differential subsidy contracts in issue, with one exception, did not list fuel costs specifically as an item eligible for subsidy consideration.

Plaintiffs' vessels are bulk cargo vessels. Such vessels sell their services in the form of charters for the carriage of cargo ideally in full shipment lots for one customer at a time. However, at times, partial shipment lots are carried on a voyage. There are two types of charters, the voyage or spot

charter and the time or term charter. Under a voyage charter, the shipowner undertakes to carry a load of a charterer's cargo between specified terminals at an agreed price, usually stated in dollars per ton. Under this type of charter, the shipowner usually pays all operating expenses, including fuel costs. Under a time or term charter, the shipowner places the vessel's carrying capacity at the disposal of the charterer for an agreed period, at a price usually stated in dollars a day, or, as in this case, in dollars per ton of carrying capacity per month. Time charters customarily provide that charterers assume fuel costs, port charges, tolls, and other voyage costs that shipowners customarily assume under voyage charters.[1] Shippers, such as oil companies, use both voyage charters and time charters to supply their need for shipping service. Time charters afford stability in the availability and cost of service, whereas voyage charters allow for flexibility in requirements for service and fluctuation in its costs. Further, the owner of a vessel bears little or no financing or operating risks since they are borne generally by the charterer. Too, the charterer, not the owner, bears the risk of market and other cost fluctuations. Finally, the time charterer has operational control of the vessel and the financial and employment risk associated with the chartered vessel.

Charters are negotiated between shipowner and charterer. When chartering tonnage on a term basis, some charterers would use formulas that convert proffered time charter rates to equivalent voyage costs and may take into account, *inter alia*, fuel consumption for the service in which the charterer plans to employ the vessel. Obviously, if the charterer felt that any costs would increase over the term of the charter, the charterer would negotiate for a lower time charter rate to offset the expected high costs. The shipowner, obviously, would negotiate for the highest rate it could get.

The charter hire agreements that plaintiffs entered into with charterers provided, in most instances, that the charterers, not plaintiffs, would be responsible for fuel costs. It is important to note that the owners of the vessel negotiated the time charters of the vessel with the contractors. At the time the time charters were negotiated, it was known that fuel costs for steam engine powered vessels were greater than for diesel engine powered vessels and that repair costs for diesel powered engines were greater than for steam powered engines. Further, diesel engines generally burn a variety of fuels which are more expensive than Bunker C fuel which turbine engines use almost exclusively. There are also conditions under which a diesel vessel will consume more fuel than a turbine engine in port. In comparing turbine engine operations with diesel engine operations it is desirable to get engines as closely identical as possible if the comparison is to be as reliable as possible.

When these time charter agreements were negotiated, the difference between the fuel costs for steam powered vessels and diesel powered vessels was not viewed as significant because plaintiffs believed that the cost differential at the time of negotiation of many of the time charter hire was not enough to affect competition significantly. To limit the financial risks for the vessel owner, one charterer agreed on twenty-year terms (the charter agreement was effective from the dates of delivery of the vessels), with the escalation of operating expenses over $4400 a day for the charterer's account. Many of the vessels were chartered for twenty-year terms.

There is no reliable evidence in the record that any specific time charter rate was lower because the time charterer was assuming the cost of paying for the fuel. Further, since a number of the vessels in issue were chartered by oil companies, it seems reasonable to conclude that the cost of bunker fuel to operate said vessels was not a major concern to them at the time the

1. Since the time charterer pays such operational expenses, that charterer has the privilege of deciding on the deployment of the vessel and the speed of the vessel, both of which affect fuel consumption. Under a voyage charter, the shipowner controls these factors. *See Asco–Falcon II Shipping Co. v. United States,* 18 Cl.Ct. 484, 491–92 (1989).

charters were entered into because of the nature of the business of the time charterers.

Six of the vessels operated under time charters which provided that the charterer, not the vessel owner, was obligated absolutely to pay fuel costs for the period of the charter and that this obligation to pay fuel costs exists even if the vessel was not in service, *i.e.*, off-hire or laid up. This type of time charter was referred to as a "hell or high water" charter. Vessels that operated under this type of charter were the Ultramar, Ultrasea, Golden Dolphin, Golden Endeavor, Beaver State, and Rose City.

The Ultramar, Ultrasea, Rose City, and Beaver State vessels were chartered for twenty years, beginning on August 8, 1973, March 19, 1974, April 14, 1976, and July 23, 1976, respectively. The Golden Dolphin and the Golden Endeavor were chartered for seven years in June 1972, but the charters were renegotiated for twenty-year terms in February 1974. The charters for the vessels Ultramar, Ultrasea, Golden Endeavor, and Beaver State were co-extensive with the operating-differential subsidy contracts, *i.e.*, June 30, 1971, June 30, 1971, June 30, 1972, and February 23, 1973, respectively. While the charter for the Golden Dolphin was co-extensive with the operating-differential subsidy contracts, *i.e.*, June 30, 1972, this vessel sank in 1982. The Rose City charter was also co-extensive with the operating-differential subsidy contracts. This vessel was converted to a United States Navy hospital ship in 1985. It is important to note that while the charter hires were co-extensive with the operating-differential subsidy contracts, *i.e.*, they were entered into on or about the time the subsidy contracts were entered into, they did not become operative for purpose of the charter hire period, *e.g.*, twenty-year period, until the vessel was delivered for in-service operations.

Eight of the vessels operated under time charters which provided that the charterer, not the vessel owner, was obligated to pay fuel costs for the period of the charter. However, the charters for these vessels had a provision that allowed for suspension of charter hire payments for fuel costs while the vessel was in dry dock for emergency repairs or otherwise off-hire. Vessels that operated under this type of time charter were the Coronado, Cherry Valley, Chelsea, Worth, Chestnut Hill, Kittanning, Golden Monarch, and American Heritage. Evidence in the record suggests that the charterers of the Coronado, Cherry Valley and Chelsea paid for the cost of lay-up in many instances. The evidence is less clear as to the charterers of the other five vessels. The Coronado, Cherry Valley, and Chelsea were chartered for fifteen years beginning December 28, 1973, July 10, 1974, and December 28, 1974, respectively. The Worth, Chestnut Hill, and Kittanning were chartered for ten years beginning February 19, 1976, December 1, 1976, and March 2, 1977, respectively. The Golden Monarch was chartered for ten years beginning June 25, 1975, and was laid-up on delivery by charter but commenced its first voyage in October 1975. However, on March 8, 1977, the Golden Monarch was rechartered for fifteen years. The American Heritage was chartered for twenty-five years beginning December 30, 1976. This charter was later rescinded, and on December 30, 1976, American Heritage was chartered for fifteen years. The Coronado, Cherry Valley, and Chelsea came off fifteen-year charters around December 1988, July 1989, and December 1990, respectively. The Worth was converted to a United States hospital ship in 1984. After the time charters of the Chestnut Hill and Kittanning expired, the Kittanning was redelivered to its owner in December 1986 and the Chestnut Hill was redelivered to its owner in January 1987. Since the above dates, these two vessels have operated in the spot market in the preference trade. The Golden Monarch time charter expires in March 1992, some three years short of the termination of the vessels operating-differential subsidy contract termination date of 1995. The American Heritage time charter expired on December 31, 1991, some five years short of its operating-differential subsidy contract termination date of 1996.

The owner, Aeron Marine Shipping Company (Aeron Marine), of five vessels—Golden Dolphin, Golden Endeavor, Gold Monarch, Ultramar, and Ultrasea—negotiated twenty year charters with contractors which contained an "all expense hell or high water" provision under which the charterer would pay all of the vessels operating expenses as part of the charter hire. Under this provision the vessel's operating agent would inform the charterer monthly of the respective vessel's operating expenses. The charterer would advance these amounts to the vessel's agent for disbursement to the vessel creditors and these advances were subject to latter adjustments when accounts were settled. For example, vessel crews who were employees of a crewing agent were paid their wages, fringes, and payroll taxes by the crewing agent. The charterer either reimbursed or advanced necessary sums to the crewing agent for these payment purposes. The point is that the charterer paid the vessel's operating expenses. The charterer also paid the vessel's operating fuel costs, but there is no contention that the charterer advanced or reimbursed the agents for fuel cost payment purposes. The record suggests the charterers paid for the fuel costs themselves.

The operating-differential subsidy agreements for twelve of the fourteen vessels at issue in this litigation did not specifically provide for fuel cost subsidy. For two vessels (Golden Dolphin and Golden Endeavor), a conditional fuel cost subsidy was provided for in their operating-differential subsidy agreements. This subsidy has been referred to by the plaintiffs as the "Aeron fuel subsidy." The conditional nature of this subsidy will be discussed later in this opinion when plaintiffs' claim relative thereto is considered.

The vessels in issue belong to two primary classes. Each class has distinctive characteristics and capabilities, e.g., normal cruising speed, dead weight tonnage, fuel consumption, etc. In the San Clemente class were the following vessels: Ultramar, Ultrasea, Golden Dolphin, Golden Endeavor, Golden Monarch, Rose City, Beaver State, Worth, American Heritage, Chestnut Hill, and Kittanning. The San Clemente class vessels were either ore-bulk oil carriers (OBOs) or tankers. The OBO vessels were designed for dry or liquid cargo alternatively, whereas the tankers were designed exclusively for liquid cargo. Coronado, Cherry Valley, and Chelsea made up the Coronado class. The Coronado class vessels were tankers and were designed exclusively for liquid cargo. Both classes of vessels had similar steam power plants. While the San Clemente class vessels had a normal cruising speed of 16.5 knots with fuel consumption at normal operating speed of 110 long tons a day, the Coronado class vessels had a normal cruising speed of 15.3 knots with fuel consumption at normal operating speed of 80 long tons a day. In this litigation, the vessels were at times referred to as the Berger Group (Ultramar, Ultrasea, Golden Dolphin, Golden Endeavor, Golden Monarch, Worth, Beaver State, Rose City, and American Heritage) or the Kurz Group (Coronado, Cherry Valley, Chelsea, Chestnut Hill, and Kittanning).

In late 1973 and early 1974, the organization of Petroleum Exporting Countries imposed an embargo on the export of petroleum to the United States. As a result, the price of crude oil and petroleum products suddenly increased drastically. The price of Bunker C, the refinery residue used as boiler fuel by steam vessels, rose from $3.42 a barrel in January 1973, and $3.95 a barrel in July 1973, to $11.20 a barrel in January 1974. The price of Bunker C per barrel rose each year subsequent to 1974 until it peaked in 1984–85, then drifted downward. In December 1987, the price of Bunker C was about $13 a barrel.

Plaintiffs, in their presentations to the Board, utilized the average New York price of Bunker C in January for the years 1973 to 1987 in an effort to establish the amount of subsidy they believed they were entitled to receive. Plaintiffs did this because they presented no data to the Board relative to the actual fuel costs incurred by the vessels for which they seek subsidy payments. As indicated earlier, the time charterers, not plaintiffs, paid for the cost of fuel for which subsidy is sought. Since the time

charterers paid the fuel costs, they had, presumably, the data relative thereto as applicable to each vessel for which subsidy is sought. Plaintiffs did not have this data, since they allege it was considered propriety data by the charterers and thus not subject for disclosure to them.

Plaintiffs believed New York to be a major petroleum market and pricing base and thus its Bunker C prices, plaintiffs assumed, would be representative of worldwide prices. However, the record indicates that the vessels at bar took a number of voyages where they bought Bunker C fuel at a variety of ports other than New York and yet no details were submitted in the record of these purchases. In essence, plaintiffs' subsidy compensation reflected estimates of how much it might have cost them to buy fuel at New York prices. The Board, for a variety of reasons, found plaintiffs' computations of the subsidy for which they sought recovery to be too speculative to warrant the relief sought in any event.

Plaintiffs contend that the drastic increase in the cost of fuel during the period 1974–1987 significantly increased the costs of operating the vessels in issue. Further, the fuel crisis also magnified the disparity, plaintiffs aver, between the fuel costs of the vessels in issue and the fuel costs of similar foreign-flag vessels. While higher fuel costs were experienced by both United States and foreign vessels during this period, United States steam vessels in their operations utilized more fuel than the more fuel efficient diesel powered foreign vessels. This fact alone, plaintiffs maintain, rendered the vessels in issue less competitive than foreign-flag vessels during the 1974–1987 period. Plaintiffs make feeble efforts to downplay the fact that the charterers of the vessels and not plaintiffs paid the fuel costs for vessel operations and thus bore the brunt of any fuel price disparity. Plaintiffs do allege that the Ultramar suffered fuel costs of some $20 million during the claim period. These costs are borne by the time charterers of the Ultramar, not the owner, a plaintiff herein, of this vessel.

One of the owners of several of the vessels in issue, Leo V. Berger (Berger), testified before the Subsidy Board that after the oil embargo in 1974, fuel costs for San Clemente tankers averaged $7,000 a day, while crew costs averaged $4,000 a day. Since 1974, Berger continued, the disparity in fuel costs between the San Clemente tankers and similar foreign-flag ships has been almost as large (or larger than) the cost disparity in wages of officers and crews, maintenance and repairs, and insurance combined. It is noted that while these bare facts are obviously distressing, it must be remembered that wages, maintenance and repairs, and insurance were subsidized items and presumably eased the pain of cost increases. Likewise, the dramatic increase in fuel prices was borne by the charterers of Berger's vessels and not by Berger as owner of the vessels. This is a significant fact in dealing with the escalation of fuel costs vis-a-vis the vessels in issue in this litigation.

To establish the impact on profitability of the operation of its vessels, plaintiffs refer to the history of the vessels Chestnut Hill and Kittanning. These vessels were delivered and placed in service on December 1, 1976 and March 1, 1977, respectively, under ten-year charter hire. The time charters of these vessels expired in December 1986 and March 1987, respectively, at which time the fuel costs of $11,000 a vessel each day shifted from the account of the time charterer Texaco to those of the owner of the vessel Chestnut Shipping Company. Plaintiffs concede that the operation of the vessel from 1976 and 1977 until the time charter hire expired in 1986 and 1987 was profitable. During this period, the fuel costs were paid by the charterer, Texaco, and not by the owner, Chestnut Shipping Company, a plaintiff herein. In 1986 and 1987, when Chestnut Shipping Company had to pay fuel costs in the operation of the vessels listed above, these vessels moved from a profit position to a loss position, even though plaintiffs aver, the revenue the vessels earned in 1987 compared favorably with their revenue under the time charter to Texaco during the 1976–1977 to 1987–1988 period. The conclusion the court

draws from this is that since the time charterers paid the fuel costs under their charter hires with plaintiffs, plaintiffs' ventures during the period of charter hire were profitable. The Subsidy Board found in its determination that the vessels in issue were profitable for the pertinent years in question, and the above discussion as well as the record before the Subsidy Board supports this finding. Further, subsequent to 1986 and 1987, it appears these two vessels engaged in the preference trade in a significant way. As will be indicated, *infra*, vessels operating in the preference trades were insulated from foreign vessel competition.

The record establishes that from 1974 to 1987, American-flag vessels' fuel operating costs were greater than fuel operating costs of like foreign-flag vessels, because the American vessels were propelled by steam turbine engines, whereas foreign vessels were diesel powered. As indicated above, in 1973 and 1974, the price of crude oil began to rise dramatically. With this rise in crude oil prices, nearly all subsidized American-flag vessels were at a substantial fuel cost disadvantage vis-a-vis like foreign-flag vessels because of higher fuel consumption required for operation of the American-flag steam powered vessels.

Plaintiffs maintain that the disparity between American vessel fuel costs and foreign vessel fuel costs was enough to price the vessels out of the world market. The Board, however, found that the employment history of the vessels in issue during the pertinent period (1974–1987) fared well with only small amounts of lay-up time. The Board, on the record before it, specifically declined to find that plaintiffs' vessels could not compete with like foreign vessels.

The record supports the generalized fact that the disparity between the fuel costs generated by steam powered American-flag vessels vis-a-vis like diesel powered foreign-flag vessels would, without more, reflect adversely, in varying degrees on the ability of American-flag vessels to compete with foreign-flag vessels. This fact was recognized by owners and operators of vessels as well as by MarAd. The vessels in issue were set for construction, for the most part, during a time frame when fuel costs represented a small percentage of operating costs. During this time frame, charter agreements for most of the vessels in issue were also negotiated. Since time charterers generally bore the burden of fuel cost payments, absent special provisions in subsidy or charter agreements, the vessel owners were insulated from the cost impact of the crude oil price rise during the life of their time charter agreements. Where vessels were offered "on the spot" market, the vessel owner would, most often, have to pay for the fuel, which would leave less in earnings for the steam vessel than for a similar foreign diesel vessel.

Plaintiffs focus almost exclusively on the fuel cost disparity generated by the steam powered plants of American-flag vessels vis-a-vis like foreign-flag diesel vessels in their quest for subsidy payments. This is an over simplification of a most complex economic-maritime situation. Just as important, there were other forces at work as well during the pertinent period.

The Arab Oil Embargo of 1973–74 caused the price of crude oil to rise dramatically as indicated previously. Not only did the cost of fuel rise, but the demand for tankers was reduced and their rates were depressed. Increases in crude oil prices during the 1970s and early 1980s added to the problem. With oil price increases came reductions in production, mainly from OPEC, resulting in even less demand for tankers. Importing nations reduced their consumption of oil and turned to alternative energy sources. Price increases caused inflationary pressures and an economic recession ensued.

The economic situation sketched out above affected bulk cargo operations generally and the vessels in issue particularly. The discovery of new oil finds in the North Sea and Mexico and the increased oil production from Central and South American countries produced new trading patterns. Consuming nations could now buy oil closer to home. Supply line distances were reduced; fewer ships were needed for shorter voyages. Furthermore, reopening and

improvement of the Suez Canal served to cut voyage distance and permitted larger vessels to be accommodated. The opening of pipelines, *e.g.*, between Saudi Arabia and Yenba, served to alter trading patterns. These factors served to reduce distances for cargo movement, led to reductions in the number and size of vessels needed, and also led to an over supply of tankers. These factors affected both American-flag and foreign-flag vessels.

Various strategies were utilized by vessel operators and/or charterers to lessen the effect of the changing times, discussed above, while maintaining operations. Some of these strategies were slow steaming, carrying partial cargos, using the tonnage as floating storage tanks, and laying up both steam powered and diesel equipped vessels.

MarAd recognized the fuel cost disadvantage of American-flag steam powered vessels. In 1976–1977, MarAd re-examined the economics of marine propulsion systems for the American-flag fleet. It proposed a new policy of offering construction-differential subsidy for new vessels utilizing foreign-made slow speed diesel engines. In 1979, MarAd published a report on the results of a study of economic considerations involved in replacing the engines in the San Clemente class tankers with, *inter alia*, diesel-fueled engines.

In addition, in the late 1970s, MarAd began to allow subsidized vessels to engage in the "preference trade." Certain cargo was designated as bulk preference cargo. The subsidy distinction for bulk cargo operators between the commercial and preference trades had a long and complicated history. That history need not play any role in the matters at hand. Suffice it to say that while the vessels at bar were in service, they have been allowed, by one means or another, to engage in foreign preference trade although without receiving ODS, except for the Russian grain trade. Trading in this designated cargo was reserved to United States-flag vessels. As a result, foreign competition was absent. Accordingly, eligible ships were all "steamers," *i.e.*, steam powered vessels.

This was known as the "preference trade." Prior to the late 1970s, subsidized vessels were not admitted to trade in preference cargo. Recognizing the impact of higher fuel costs and changes in the Maritime trade generally, MarAd, in the late 1970s, began to allow subsidized vessels, on condition, to participate in the preference trade. While engaged in the preference trade, plaintiffs' vessels were immune from the threat of foreign competition.

As indicated above, the time charterers of the vessels in issue were obligated under their time charters to pay, and they did so as a general rule, for the fuel utilized in the operation of the vessels. If the time charterers could have substituted foreign-flag vessels for their American-flag vessels, their fuels costs would, most probably, have been significantly lower. However, these charters were generally for ten or twenty years and, of course, were binding agreements. While a charterer may have found it advantageous, for fuel cost or other considerations, to lay-up a subsidized vessel and instead charter in a diesel powered foreign substitute vessel, the charterer would still be required to continue to pay charter hire for the laid-up subsidized vessel. Plaintiffs cite one instance of this relative to the vessels at issue. Plaintiffs aver that the Golden Monarch was laid-up for substitution purposes in the third quarter of 1975, the second quarter of 1976, the fourth quarter of 1978, the first quarter of 1979, the fourth quarter of 1981, the first, third and fourth quarters of 1983, the first, third and fourth quarters of 1984, all four quarters of 1985, and the first quarter of 1986. During these periods, the Monarch was ostensibly under charter hire and thus paying both charter hire to the subsidized Monarch vessel and charter hire for a foreign substitute diesel powered vessel. It should be noted that the owner of the Monarch vessel, a plaintiff herein, received charter hire compensation, presumably, during these periods when its vessel, the Monarch, was laid-up. The time charterer of the vessel, however, bore the brunt of the additional fuel costs and substitute vessel costs, not the vessel owner, a plaintiff herein.

During the period at issue in this case (1973–1987), the cost of fuel, the fuel consumption disparity between American-flag steam powered vessels and foreign-flag diesel powered vessels, and other shipping market conditions served in varying degrees to impact on the competition between American and like foreign vessels. What effect this had on the employment of the vessels in issue can be gleaned from a short review of the employment history of each vessel during the pertinent period.

*Ultramar and Ultrasea:* These two vessels were placed in service on August 8, 1973 and March 19, 1974, respectively. These vessels were owned by Aries Marine Shipping Company. On February 10, 1986, American Maritime Transport, Inc. assumed the obligations and was assigned the rights of Aries Marine.

In 1972, the United States and Russia entered into a Maritime Agreement relative to grain sales. Under this agreement, a share of the grain cargos moving from the United States to Russia was reserved for American-flag vessels, since all American-flag vessels were steam powered. This reservation sheltered American vessels from the competition of diesel powered foreign vessels. In late 1973, the Ultramar and Ultrasea suffered losses on voyages. During this period, the time charterer of the vessels was paying the fuel costs for operation of the vessels. As a result, the losses must have been due to factors other than fuel costs. Both vessels were laid-up for a period of time in 1975 for want of cargo. In 1975, the vessels, both OBOs, were permitted, on their application to MarAd, to engage in the preference trade, known as the "Russian grain trade." While not clear in the record, it appears the vessels had to forego any subsidy payment under their ODS agreements while engaged in this preference trade. Thereafter, from 1975–1979, the Ultramar and the Ultrasea devoted substantial time to voyages carrying Russian grain. In 1980, these two vessels returned to unprotected trading in world markets because the world market trade had improved. In 1981, the world market trade declined so the vessels moved into a different preference trade,

the Strategic Petroleum Reserve Trade, which was reserved for American-flag vessels thus insulating the vessels from foreign-flag competition. MarAd permitted these vessels to engage in this preference trade.

Generally, subsidized vessels prior to 1986 could only participate in the preference trade with permission from MarAd, and they also had to forego subsidy payments while engaged in the preference trade. In April 1982, the Ultramar, and in October 1982, the Ultrasea, requested permission to suspend their subsidy contracts. These vessels were allowed to do so. The vessels thereafter were admitted to engage in all preference trades. In February 1986, MarAd allowed all subsidized bulk vessels into the preference trades cargo, but they had to forego subsidy payment to do so. At the same time or thereabouts, MarAd reinstated Ultramar's and Ultrasea's subsidy contracts. These two vessels were engaged in the preference trades from 1982–1986.

From 1986 to the present, the Ultramar and the Ultrasea have been engaged in the preference trades. Plaintiffs contend that owing to the fuel cost disparities discussed previously, these vessels are economically obsolete in the international market unless said market gets significantly higher. Plaintiffs ignore the fact that these vessels had been in service for some twelve or thirteen years and thus suffered to some degree from "old age" obsolescence. The vessels, plaintiffs argue, are dependant on the preference trades for economic survival. Plaintiffs believe that the competitive disadvantage of these two vessels vis-a-vis like foreign vessels will not become insignificant in the foreseeable future.

The ODSA covering the Ultramar ends in 1993 as does the time charter covering this vessel. The ODSA covering the Ultrasea ends in 1994 as does the time charter covering this vessel. The record supports the conclusion that the Ultramar and the Ultrasea were substantially employed during the period for which plaintiffs seek subsidy.

*Golden Dolphin and Golden Endeavor:* These two vessels were placed in service on October 10, 1974 and December 13, 1974. They were time chartered initially for seven years, but these charters were renegotiated for twenty-year terms in February 1974. On February 10, 1986, American Maritime Transport, Inc. assumed the obligations and was assigned the rights of Aeron Marine.

The vessels made a number of voyages in 1974–1975. In 1976, these vessels were laid-up for a period of time for reasons not clear in the record. At some point in 1976, they returned to commercial trading where they operated through 1977.

In 1978, Aeron Marine and other shipping companies applied to MarAd for amendment of this agreement to allow them to participate in the dry bulk preference trade with subsidy. MarAd granted this application in June 1979 for Golden Dolphin and Golden Endeavor but denied it as to the other companies. However, it imposed conditions on the grants to Golden Dolphin and Golden Endeavor, *i.e.*, the vessels had to forego subsidy payments. Litigation ensued and continued until 1985 when the Court of Appeals for the District of Columbia Circuit ruled that all involved companies be admitted to engage in the preference trade. The Circuit Court also held, however, that MarAd's requirement that subsidized companies forego subsidy payments as a condition of engaging in the preference trade was legally proper. *See American Maritime Ass'n v. United States,* 766 F.2d 545 (D.C.Cir.1985). In 1986, MarAd admitted all subsidized vessels to the preference trade on the condition they forego entirely operating-differential subsidies during preference operations.

In 1979 and 1980, both Golden Dolphin and Golden Endeavor engaged in open international trade. In 1980, Golden Dolphin again entered the preference trade, Strategic Petroleum Reserve, in which the vessel continued until lost at sea in a casualty in March 1982.

Golden Endeavor remained with open international trade from 1976 until early 1982 except for two voyages in the Russian grain trade and the Strategic Petroleum trade in 1978. In 1982, Golden Endeavor again entered the preference trade, Strategic Petroleum, and remained there except for sporadic commercial voyage until mid 1984. In November 1984, the Golden Endeavor's subsidy under its ODS contract was suspended, and the vessel entered the dry bulk preference trade where it remained. Its subsidy contract was reinstated on April 14, 1986, with some occasional commercial back hauls. The vessel was laid-up for 120 days in 1987–88 for reasons not clear from the record. The owner of Golden Endeavor views the vessel as "economically" obsolete for commercial Maritime operations owing to its steam power plant. Plaintiff fails to note the age obsolescence of its vessel.

The ODSA covering the Golden Dolphin was scheduled to end in 1994 as was the time charter covering this vessel. The ODSA covering the Golden Endeavor ends in 1994 as does the time charter covering this vessel. The record supports the conclusion that the Golden Dolphin and Golden Endeavor were significantly employed during the period for which plaintiffs seek subsidy.

*Rose City, Worth, Beaver State, Chestnut Hill and Kittanning:* These five vessels have various owners. They were delivered for service at various times between February 1976 and March 1977. They were initially chartered to the Texaco Oil Company. While chartered to Texaco, the vessels, as far as can be determined, were significantly employed in carrying cargo. Texaco kept the vessels on slow steaming most of the time. Slow steaming saves fuel. However, slow steaming also sacrifices time. Texaco ostensibly believed it was better to save fuel and reduce costs rather than expend fuel for high speed at increased costs to expedite delivery of cargo and possibly make more voyages. It is noted that foreign diesel powered vessels also were slow speed vessels. Indeed, as indicated earlier, MarAd in the late 1970s was considering offering construction-dif-

ferential subsidy for new vessels utilizing foreign-made slow speed diesel engines.

In 1982, Texaco placed the Chestnut Hill and the Kittanning in the preference trade (Strategic Petroleum Reserve). Texaco was not interested in renewing their ten-year time charter and proposed laying up the vessels. The owners of the vessels, however, negotiated an arrangement whereby the vessels were subchartered from Texaco and thereafter utilized in the preference trade. It is to be borne in mind that while engaged in the preference trade, the vessels were not entitled to subsidy.

In 1984, an opportunity arose to sell vessels to the Navy for conversion to hospital ships. The owners of the Rose City and the Worth vessels offered these two vessels to the Navy, and their offers were accepted in 1985. Texaco, which had time chartered these two vessels for ten-year periods, relinquished its right to employ the vessels for the remainder of the ten year charters. The Rose City Texaco time charter was due to expire on or about July 1986, and the Worth Texaco time charter was due to expire on or about February 1986.

The Beaver State vessel was delivered for service on April 14, 1976. It was subchartered to Texaco, which subcharter expired in February 1986. Ownership of the vessel was then transferred to Aries Shipping Company. Aries thereafter time chartered the Beaver State from American Shipping, Inc., which had an outstanding bareboat charter on the vessel, on an all expense basis. Since 1986, the Beaver State vessel has been trading in the spot market, primarily for dry bulk preference cargos.

The ODSA covering the Worth was scheduled to end in 1996, whereas its charter was scheduled to end in 1986. The ODSA covering the Beaver State ends in 1996 as does the charter covering this vessel. The ODSA covering the Chestnut Hill ends in 1996, whereas the charter covering this vessel ended in 1986. The ODSA covering the Kittanning ends in 1997, whereas the charter covering this vessel ended in 1987. The ODSA covering the Rose City

was scheduled to end in 1996, whereas its charter was scheduled to end in 2001. The record supports the conclusion that the above five vessels were significantly employed during the period for which plaintiffs seek subsidy.

*Coronado, Cherry Valley and Chelsea:* These three vessels were time chartered to Shell Oil Company. Like Texaco, Shell engaged in slow steaming, presumably for fuel conservation purposes since Shell, like Texaco and other time charterers, was obligated to pay for the fuel consumed in operating the ships under the time charter. The Shell time charters were for fifteen-year periods. The in-service delivery dates for the Coronado, Cherry Valley, and Chelsea were December 28, 1973, July 10, 1974, and December 28, 1975, respectively. In 1976, the Coronado and Cherry Valley were placed in the preference trade, Russian grain, for one voyage each. In 1981, Shell placed all three vessels in the preference trade, Strategic Petroleum Reserve, where they spent most of their time thereafter.

In 1985, Shell indicated it would not exercise its option to renew the time charters on these vessels at the expiration of their fifteen-year terms. The grounds stated by Shell in this regard were, "inflexibility" of the vessels "as black oilers only, with unusual length deadweight ratio" and "in spite of all due diligence on board to curtail fuel consumption, they remain steam ships and thus costly to operate." During negotiations between the owner of the vessels and Shell in 1985–86, Shell laid-up two of the vessels and was about to lay-up the third vessel when the owner negotiated an agreement with Keystone, whereby Keystone would subcharter the vessels and operate them in the preference trade. In 1986 and 1987, Shell resumed operation of the vessels under their time charters.

The ODSA covering the Coronado ends in 1993, whereas the charter covering this vessel ended in 1988. The ODSA covering the Cherry Valley ends in 1994, whereas the charter covering this vessel ended in 1989. The ODSA covering the Chelsea ends in 1995, whereas the charter covering the vessel ended in 1990. Thereafter the

vessels were operated in the spot market. The record supports the conclusion that the above three vessels were significantly employed during the period for which plaintiffs seek subsidy.

*Golden Monarch and American Heritage:* The Golden Monarch was delivered for service on June 25, 1975, but was laid-up by the charterer on delivery. The vessel commenced its first voyage in October 1975. The record is unclear on the reason for the lay-up. The vessel made one voyage in the preference trade (Russian grain) in 1975–76 and then was laid-up until 1977. The reason for this lay-up is not apparent. In 1977, the vessel was chartered to Amerada Hess Corporation (Hess) for a fifteen-year term. Hess operated the vessel until 1983 when the vessel was laid-up for four months. Golden Monarch was again laid-up for a period in 1986. Most of the voyages of the Golden Monarch during the period for which subsidy is sought were in the worldwide trade except for the Russian grain voyage mentioned above and a handful of other preference trade (Strategic Petroleum Reserve) voyages. The time charter to Hess of the Golden Monarch expired in early 1992.

The American Heritage was delivered for service on December 30, 1976. This vessel was time chartered to Hess. The American Heritage was laid-up for two months in 1983 and was again laid-up for a period in 1986. Most of the voyages of this vessel were in the worldwide trade except for a handful of preference trade voyages (Strategic Petroleum Reserve). The time charter to American Heritage expired at the end of 1991.

The ODSA covering the Golden Monarch ends in 1995. This vessel was covered by four charters prior to 1977. The 1977 charter to Hess expired in 1992. The ODSA covering American Heritage ends in 1996. This vessel was first chartered to end in 2001, but this charter was rescinded and the vessel was chartered to Hess in 1977 which charter ends in 1996. The record supports the conclusion that the Golden Monarch and American Heritage were sub-stantially employed during the period for which plaintiffs seek subsidy.

In summary, the Board found, as to the fourteen vessels in issue, that the vessels fared well in employment, with relatively small amounts of lay-up time during the period for which subsidy is claimed. Further, the Board found that since charter hire payments to the owners by the charterers generally continued during voluntary lay-up for want of cargo, the plaintiffs suffered little or no monetary loss during these lay-up periods. From a profit viewpoint, the Board found that the vessels in issue, based on financial figures submitted to MarAd by the owners for the pertinent years, did well in their employment.

On July 23, 1984, the Berger Group (nine vessels) filed applications with the Maritime Subsidy Board (Board) seeking fuel cost subsidies based on the fuel cost disparity between steam powered American vessels and like diesel powered foreign vessels. On January 29, 1985, the Board denied these applications without a hearing. In essence, the Board denied these applications for fuel cost subsidies because there was no statutory mandate for the Board to pay fuel cost subsidy as there was for subsidy cost payments for wages, insurance, maintenance and repairs under section 603(b) of the Merchant Marine Act of 1936, as amended, 46 U.S.C.App. § 1173(b). Further, the ODSAs entered into between MarAd and the plaintiffs likewise did not encompass fuel cost subsidy but covered only subsidy costs for wages, insurance, maintenance and repairs. Indeed, the Board had never, as observed by the court in its prior opinion in this case, used the discretionary power given it by section 603(b), whereby it "may pay ... such sums as ... [are] necessary to make the cost of operating [an American] vessel competitive with the cost of operating similar vessels under the registry of a foreign country," *Aeron Marine*, 10 Cl.Ct. at 244 n. 5, to pay ODS for fuel costs.

In its July 27, 1986 opinion, the court remanded this case to the Board for a hearing on plaintiffs' applications for fuel cost subsidy. *Aeron Marine*, 10 Cl.Ct. at

251. After a hearing on plaintiffs' applications, the Board denied plaintiffs' applications in a Final Opinion and Order dated July 30, 1990, as amended on July 31, 1990.

In its July 30, 1990 opinion, the Board considered plaintiffs' procedural allegations of arbitrary action and the various claims they presented in support of fuel cost subsidies. In what has been referred to as plaintiffs' "Global" or "Overall Claim," the Board denied plaintiffs' fuel cost subsidy primarily because plaintiffs did not, in fact, incur fuel cost expenses in the operation of the vessels in question. The Board likewise denied plaintiffs' "Aeron Contract Claim" or particularized vessels claim for two reasons. First, it decided that the fuel costs (subsidy payment with respect to a propulsion system expense differential) provided in the Aeron contract were not payable because said fuel costs were not incurred by plaintiffs, but were incurred by the charters of the vessels covered by Aeron-type contracts. Second, the contract, by its terms, did not require the payment of fuel subsidy in any event. The Board also denied plaintiffs "Soviet Grain Claim" because the time charterers paid the fuel costs for which subsidy was claimed. The Board addressed and decided various other claims advanced by plaintiffs, including a post charter claim and an off-hire or laid up claim.

## DISCUSSION

### I. Jurisdiction

■ The Act provides, in substance, that subsidies shall be available for wages, insurance, maintenance and repairs in the operation under United States registry of vessels covered by an operating-differential subsidy contract. 46 U.S.C.App. § 1173(b); see Aeron Marine, 10 Cl.Ct. at 239. Pertinent to this case, the Act further provides:

> \* \* \* \* \* \*
>
> That the Secretary of Transportation [Commerce] may, with respect to any vessel in any essential bulk cargo carrying service as described in section 1121(b) of the title, pay, in lieu of the operating-differential subsidy provided by this sub-

section (b), such sums as he shall determine to be necessary to make the cost of operating such vessel competitive with the cost of operating similar vessels under the registry of a foreign country. 46 U.S.C.App. § 1173(b).

As noted earlier, fuel costs were not designated as subsidy eligible items by the Act. Further, fuel costs were not listed as subsidy eligible items in the operating-differential contracts except in the operating-differential subsidy contract where the vessels were powered by a propulsion system. This exception embraced only two of the fourteen vessels in issue, the Golden Dolphin and the Golden Endeavor. In its initial denial of plaintiffs' fuel cost subsidy request, the Board based its determination on the fact that neither the Act nor the plaintiffs' operating-differential subsidy agreements specifically designated fuel costs as a subsidized item. See Aeron Marine, 10 Cl.Ct. at 245–46. Plaintiffs, as stated previously, are bulk cargo carriers and as such were brought into the subsidy program by the 1970 amendments to the Act.

In its prior decision in this case, the court concluded that the Act and its legislative history mandated the payment of money sufficient to confer jurisdiction on this court to hear plaintiffs' claim for subsidy payment for fuel costs. See Aeron Marine, 10 Cl.Ct. at 248–50.

A decision issued by the Federal Circuit subsequent to the court's prior decision in this case on the jurisdictional issue causes the court to revisit this issue. In Huston v. United States, 956 F.2d 259 (Fed.Cir. 1992), the Federal Circuit held that a pay adjustment statute, 5 U.S.C. § 5333(b), which provided that "a General Schedule employee may be paid at one of the rates for his grade which is above the highest rate of basic pay being paid to any such prevailing-rate employee regularly supervised, or at the maximum rate for his grade, as provided by the regulations, (emphasis added)" was not a "money-mandating" statute. Thus, this court was without jurisdiction to consider a claim by a General Schedule employee for a pay adjustment

pursuant to 5 U.S.C. § 5333(b). The "may" language of the statute was the touchstone for the Federal Circuit's holding in *Huston. But see Tyson v. United States,* 91 Ct.Cl. 139, 143, 32 F.Supp. 135, 137 (1940); *Rickard v. United States,* 11 Cl.Ct. 874, 876–78 (1987).

The pertinent language of section 1173(b), quoted above, provides that the Secretary "may ... pay such sums as he determines to be necessary to make the cost of operating such [United States] vessel competitive with the cost of operating similar vessels under the registry of a foreign country...." This language confers discretion on the Secretary to pay fuel costs. The court has previously so held. *See Aeron Marine,* 10 Cl.Ct. at 249.[2] *See also Andersen Consulting v. United States,* 959 F.2d 929 (Fed.Cir.1992) (use of "may" in Competition in Contracting Act of 1984, 40 U.S.C. § 759(f)(5)(B)) and *Dehne v. United States,* 970 F.2d 890, 893–894 (Fed. Cir.1992). Whether the presence of "may" in the Act is such as to cause it to be a non money-mandating statute sufficient to preclude jurisdiction in this court is a question that is not quite so clear. The court wrestled with this question in its prior decision in this case and again revisited it in view of the *Huston* decision cited above.

For reasons set forth in its prior decision, the court concludes that the Act, as amended, based on its provisions and its legislative history, and the operating-differential subsidy contracts plaintiffs entered into are sufficiently money-mandating to confer jurisdiction on this court to consider whether the Board's denial of fuel cost subsidy to plaintiffs was arbitrary and capricious and/or an abuse of discretion. *See Moore–McCormack Lines, Inc. v. United States,* 188 Ct.Cl. 644, 654–69, 413 F.2d 568, 574–83 (1969).

## II. Standard of Review

Plaintiffs argue that the Board's decision is reviewable under an arbitrary, capricious, or abuse of discretion standard pursuant to either the Administrative Procedure Act, 5 U.S.C. § 706 (1988), as a result of the incorporation of Section 606(1) of the Merchant Marine Act of 1936, or the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1988).[3] Section 606(1) of the Merchant Marine Act provides for the Secretary of Transportation to determine the facts and make such readjustment as he deems fair and necessary after holding a proper hearing. Although plaintiffs admit that "some degree of presumptive validity may attach to factual findings of the Secretary," they nevertheless claim that the court may make *de novo* factual findings on the administrative record. Plaintiffs conclude that the Board's decision is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and made without regard for proper procedure.

■ Generally, without more, administrative determinations are reviewed to determine if they are arbitrary, capricious, an abuse of discretion, not in accordance with the law, not in compliance with procedural requirements, or unsupported by substantial evidence. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Marathon Oil Co. v. United States,* 17 Cl.Ct. 116, 120 (1989); *Parks v. United States,* 15 Cl.Ct. 183, 189 (1988); *see* 5 U.S.C. § 706(2)(A). This standard applies to determinations of the Maritime Subsidy Board. *See Aeron Marine Shipping Co. v. United States,* 695 F.2d 567, 573 (D.C.Cir.1982); *Prudential Lines, Inc. v. United States,* 79 B.R. 167 (Bkrtcy. S.D.N.Y.1987); *Farrell Lines, Inc. v. Dole,*

---

**2.** In its prior decision, the court faulted the Secretary for not exercising any discretion relative to plaintiffs' entitlement to fuel cost subsidy. *See* 10 Cl.Ct. at 249. As a result, the issues now before the court were not considered nor decided previously, either directly, indirectly or by inference.

**3.** Since the Wunderlich Act applies to a provision in a contract relating to the decision of an

agency head and not a situation such as the case at hand where plaintiffs seek, for the most part, a subsidy through a statute and not a contract, the Wunderlich Act does not apply. *See* 41 U.S.C. § 321 (1988); *Asco–Falcon II Shipping Co. v. United States,* 18 Cl.Ct. at 491–92; *Moore–McCormack Lines, Inc. v. United States,* 188 Ct. Cl. 644, 669, 413 F.2d 568, 583 (1969).

619 F.Supp. 298, 308 (D.D.C.1985), *rev'd on other grounds*, 901 F.2d 1119 (1990); *Aeron Marine*, 10 Cl.Ct. at 250. Because the Board, like other agency boards, has expertise in its subject area, the reviewing court pays deference to the agency's factual findings. "Although ... [the] inquiry into facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823; *Hines v. Secretary of HHS*, 940 F.2d 1518, 1523 (Fed.Cir.1991). The Board's decision is not subject to *de novo* review.[4] *See Town of Fallsburg v. United States*, 22 Cl.Ct. 633, 642 (1991). This is especially true in these cases where MarAd is entrusted with the administration of the Act. *See American Maritime Ass'n v. United States*, 766 F.2d 545, 560 (D.C.Cir.1985). Rather, the scope of the inquiry permitted under the standard is limited to the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Parks v. United States*, 15 Cl.Ct. at 190.[5]

■■■ The standard for determining whether the agency's decision is arbitrary and capricious is "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. Under this standard, the reviewing court must determine whether the agency action was reasonable but may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park*, 401

U.S. at 416, 91 S.Ct. at 823; *Town of Fallsburg*, 22 Cl.Ct. at 645. In this regard, there also must be substantial evidence to support the factual determinations made by the Board.

■■■ Although the Board is generally deemed to be the finder of fact, questions of law are for the court to determine. However, legal determinations made by the Board are entitled to great weight if they are based on the Board's expertise and are not unreasonable. *Dale Ingram, Inc. v. United States*, 201 Ct.Cl. 56, 71, 475 F.2d 1177, 1185 (1973); *Clay Bernard Systems Int'l, Ltd. v. United States*, 22 Cl.Ct. 804, 810 (1991); *Utley–James, Inc. v. United States*, 14 Cl.Ct. 804, 810 (1988). The court must decide whether the Board's legal determinations fall within the zone of reasonableness. *Dale Ingram, Inc.*, 201 Ct.Cl. at 71, 475 F.2d at 1185.

## III. The Board—Its Character and Procedures

Plaintiffs challenge the Board's character and also allege that the Board committed certain procedural errors in its consideration of plaintiffs' application for fuel cost subsidy thereby rendering the Board's decision arbitrary and capricious. Ostensibly, plaintiffs feel these deficiencies are such as to warrant rejection of the Board's unfavorable determinations against plaintiffs and thus require *de novo* review by the court of the entire process. The court

---

**4.** *De novo* review under 5 U.S.C. § 706 (1988), is the exception rather than the rule, unless a statute dictates otherwise. *Hedman v. United States*, 15 Cl.Ct. 304, 320 (1988). The exceptions allow *de novo* review when: (1) the action taken by the agency is adjudicatory in nature, and the agency factfinding procedures are inadequate; or (2) the issues that were not before the agency are raised in a proceeding to enforce non-adjudicatory agency action. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Hedman v. United States*, 15 Cl.Ct. at 320. Neither exception is applicable here. *See also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985).

**5.** Defendant, relying on *Independant Meat Packers Assoc. v. Butz*, 526 F.2d 228, 238–39 (8th

Cir.1975), *cert. den.*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976), argues that plaintiffs may not supplement the administrative record by including documents in the appendix to their brief submitted to the court that were not before the Board. While the court agrees that judicial review generally is limited to the administrative record, it reads *Independant Meat Packers* as viewing record supplementation by way of affidavit, deposition, or other proof in exceptional circumstances as a possibility. *See Doty v. United States*, 24 Cl.Ct. 615, 624 n. 12 (1991). *But see Cohen*, 212 Ct.Cl. 568, 572; *Parks v. United States*, 15 Cl.Ct. 183, 190 (1988). However, plaintiffs have not shown the court that the process before the Board was flawed in such a way as to allow supplementation as a right.

will now consider the various charges leveled against the Board by plaintiffs.

■ First, plaintiffs argue that the Reagan Administration's Maritime policy and guidelines, issued in late 1982 and based on the view that the American fleet must become competitive to the extent possible without further subsidy, caused the Board to prejudge the results in the cases at bar. In making this argument, plaintiffs rely on materials outside the administrative record. Plaintiffs seek to utilize this material, generally press releases, to impugn the Board's integrity. The court finds that these materials do not impugn the Board's integrity. These materials indicate that the Reagan Administration found that the subsidy programs established under the Act of 1936 neither prevented nor corrected the decline of American Shipping. It was noted that forty-two percent of American foreign trade moved in U.S. flag ships in 1950. This figure dropped to eleven percent in 1960, to five percent in 1970, and to four percent in 1982. Yet, from 1972 to 1982, some $3 billion were paid as subsidies for American flag vessel operations. As plaintiffs acknowledge, the Reagan policy made it clear that all existing subsidy contracts would be honored. Plaintiffs do not put forth any evidence which indicates that these guidelines caused the Board to disregard the evidence at the hearing or prejudge the results reached.

■ Plaintiffs claim the Board assured the outcome in advance by issuing a pre-hearing "declaratory order," which stated: "as a matter of law ... an ODS operator must itself incur a cost before the operator is eligible for an ODS payment for that cost." Plaintiffs contend this order was an improper pre-hearing appeal from the denial of the staff's motion for summary disposition of plaintiffs' applications. This ruling, plaintiffs argue, violates both the Mar-

itime Administration's rules of practice and the basic concept of fair procedure. Plaintiffs do not provide objective support for these charges.

■ MarAd is vested by statute with significant discretion in the conduct of hearings in subsidy cases. *American Maritime Ass'n*, 766 F.2d at 560. To facilitate the process, the Board may issue orders much as the courts do in litigation.[6] In fact, the declaratory order which the plaintiffs find so disturbing is similar to a motion in limine, issued by a court to simplify issues for trial and thus render the subsequent trial more efficient. *See generally White Mountain Apache Tribe v. United States*, 10 Cl.Ct. 115, 116 (1986); *Baskett v. United States*, 2 Cl.Ct. 356, 359, 367–68 (1983). Plaintiffs claim that the Board disregarded their request to simplify the issues, but they fail to recognize that this is what the Board did when it issued the declaratory order.

Contrary to plaintiffs' contention, the declaratory order in question did not deprive plaintiffs of notice and opportunity to be heard. Section 201.75 provided plaintiffs an opportunity to answer defendant's petition for a declaratory order, which plaintiffs did on October 14, 1987. Plaintiffs were given ample opportunity to respond before the Board issued the order now under attack and were not precluded from briefing the issue of law involved in the petition. In its order the Board stated in pertinent part "... this Order does not have the effect of denying applicant's claim. This Order merely sets forth the correct legal standard to be applied in this proceeding and in no way reaches or attempts to reach whatever factual disputes the parties may have...." The order therefore was not viewed as an appeal from the ALJ's order denying summary disposition. The staff's motion did not

---

**6.** The regulations governing formal proceedings in subsidy cases specifically provide for such an order.

§ 201.74. Declaratory orders.

The Administration may issue a declaratory order to terminate a proceeding or to remove uncertainty. Petitions for the issuance thereof shall state clearly and concisely the nature

of the controversy or uncertainty, shall cite the statutory authority involved, shall include a complete statement of the facts and grounds supporting the petition, together with a full disclosure of petitioner's interest.

46 C.F.R. § 201.74 (1966). In the court's view, the Board's actions were within the purview of this regulation.

meet the criteria for summary judgment precisely because issues of fact did indeed exist. The ALJ did not resolve the legal issue on its merits. The court finds that the declaratory order issued by the Board simply resolved a legal issue before the hearing. It was based on the Board's familiarity with the Act and was a reasonable and rational determination. Therefore, the court will not disturb the Board's procedural actions. *Dale Ingram, Inc.,* 201 Ct.Cl. at 71, 475 F.2d at 1185. More importantly, plaintiffs in this regard have had the opportunity to contest the legal sufficiency of that order in the present litigation.

■■■ Additionally, plaintiffs allege the Board erred procedurally when it denied plaintiffs' request for oral argument before it issued a final decision on their claims. However, plaintiffs fail to cite any support mandating oral argument before the Board. This right is not provided by the governing statute. In fact, the statute leaves oral argument to the discretion of the judge.

> If oral argument before the Administration is desired on exceptions or replies to exceptions to an initial, recommended, or tentative decision ... a request therefor shall be made in writing properly addressed to the Administration.... Requests for oral argument will be granted or denied in the *discretion* of the Administration ... (emphasis added).

46 C.F.R. § 201.166 (1966).

The Subsidy Board denied the request for oral argument "because oral argument would not alleviate any deficiency in the evidence of record; and the legal arguments asserted by applicants have been clearly presented and do not need elucidation." The grant of discretion means that the Administrator, or Subsidy Board in this case, does not need to allow oral argument if no useful purpose would be served. Plaintiffs have not convinced the court that the Subsidy Board acted arbitrarily or capriciously when it denied plaintiffs' request for oral argument. *See Steele v. United States,* 150 Ct.Cl. 47, 51 (1960). It should be remembered that while oral argument is often presented, it is not granted as a mat-

ter of course. *See Ampex Corp.,* 211 Ct. Cl. 366, 367 (1976); *In re Newman,* 763 F.2d 407, 410 (Fed.Cir.1985); *Cooper v. United States,* 11 Cl.Ct. 471, 472 (1987), *rev'd on other grounds,* 827 F.2d 762 (1987); *Amendola v. Secretary of HHS,* No. 90–766V, 1991 WL 43027, Order of Dismissal (Cl.Ct.Spec.Mstr. March 14, 1991), *sustained,* 23 Cl.Ct. 621 (1991).

■■■ Plaintiffs also claim the Board did not have the exhibits from the administrative record before it when it ruled on plaintiffs' exceptions to the initial ALJ decision issued May 4, 1989. In this regard, plaintiffs argue, the missing exhibits contributed to the arbitrariness of the Board's July 31, 1990 final decision. Plaintiffs do not contend that the Board did not have the record before it when it reviewed the initial decision. A reasonable reading of the materials (depositions) relied on by plaintiffs, which are *de hors* the administrative record, indicates that the administrative record and all critical exhibits were readily available to the Board during their deliberations before issuance of the final decision. Plaintiffs do not demonstrate that the "missing" exhibits were relevant to plaintiffs' exceptions to the initial decision. Therefore, plaintiffs have not shown error on the part of the Board. In fact, in the absence of any evidence to the contrary, the court must presume that the Board performed its official duties properly. *Biddle v. United States,* 186 Ct.Cl. 87, 104 (1968). There is a presumption that public officials act in good faith in discretionary matters, and it takes strong proof to conclude that their decisions are otherwise. *Greenway v. United States,* 175 Ct.Cl. 350, *cert. denied,* 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108 (1966); *Collins v. United States,* 24 Cl.Ct. 32, 39 (1991). Plaintiffs have failed to offer the "well-nigh irrefragable proof" necessary to rebut this presumption. *McEachern v. Office of Personnel Management,* 776 F.2d 1539, 1545 (Fed.Cir.1985).

■■■ Finally, plaintiffs argue that by deciding this case with two members of the Board instead of the three members appointed to the Board, the Board erred pro-

cedurally. The court disagrees. It is not uncommon for determinations to be made by two members of a three member panel. *See American Methyl Corp. v. E.P.A.*, 749 F.2d 826, 832 (D.C.Cir.1984) (where the court determined that it would not revisit issues decided by two judge motions panel). Further, 28 U.S.C. § 46 (as amended 1978), establishing procedures for the U.S. Circuit Courts, provides that cases shall be heard by a panel of not more than three circuit judges, a majority of which shall constitute a quorum. *See also Sternberger v. United States*, 185 Ct.Cl. 528, 536–37, 401 F.2d 1012, 1017 (1968). The Board is composed of the Maritime Administrator, the Deputy Maritime Administrator and the Chief Counsel of the Maritime Administration. When determining the outcome of matters before the Board, the concurring votes of two members shall be sufficient for disposition of the matter. *See* 49 C.F.R. § 1.67 (1986). While plaintiffs agree that, "the concurring votes of two members suffice for the disposition of any matter," they interpret the regulation otherwise, relying on a case that is clearly distinguishable. *See Navajo Nation v. Hodel*, 645 F.Supp. 825 (D.C.Ariz.1986) (where court held that the failure of the review committee to meet in quorum was a violation of the Snyder Act as members acted individually). Unlike some statutes, the governing regulation does not mandate that all three members hear the evidence. *See Ayrshire Collieries Corp. v. United States*, 331 U.S. 132, 136, 67 S.Ct. 1168, 1170, 91 L.Ed. 1391 (1947). As long as two members of the Board concur, the decision is viable under Board regulations. *See Arens v. United States*, 24 Cl.Ct. 407, 418 (1991), *rev'd on other grounds*, 969 F.2d 1034 (Fed.Cir. 1992). Since the Maritime Administrator and the Deputy Maritime Administrator, as a quorum, reviewed the evidence and concurred in the decision, the Board acted in compliance with all regulations, accepted practice, and precedents.

After alleging these various procedural errors, plaintiffs conclude that as a whole "this procedural nonchalance ... fall[s] to the depth of reversible error." In the final analysis, plaintiffs' attacks on the Board's

intentions, actions, and integrity lack substance. It is well settled that public officials are presumed to perform their duties in a fair and proper manner. *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978). That presumption stands unrebutted upon review of the record in these cases.

## IV. Merits

Plaintiffs have advanced a number of claims in their effort to obtain fuel cost subsidy, in whole or in part, relative to operation of fourteen vessels in subsidized service during the period 1973–1987. Plaintiffs first seek to recover fuel cost subsidy for all fourteen vessels operating during the claim period. This claim is sometimes referred to as the "Global Claim" or "overall claim." Failing in this effort for a total recovery, plaintiffs thereafter seek to recover fuel cost subsidy for post-charter voyage claims, for particularized vessel claims, for out of service or offhire claims, and for Russian grain voyage claims.

### 1. *Global or overall claim*

■ The primary question at issue, which is sometimes referred to as the "Global Claim," is whether plaintiffs, as subsidized operators under ODS agreements, must themselves incur fuel costs in the operation of their vessels before those costs can be deemed eligible for subsidy payment. It is established that, for the most part, plaintiffs, as vessel owners, did not pay the fuel costs incurred in the subsidized operations of their vessels during the claim period. These fuel costs were incurred by the charterers of the vessels under charter agreements with plaintiffs. Plaintiffs seek to recover some $52 million for fuel expenses which were paid by the charters of the fourteen vessels during the period 1973–1987.

The Board concluded that the plain ordinary and commonly accepted meaning of the language of section 603(b) provides that ODS is payable only for costs actually incurred. *See American Science & Eng'g, Inc. v. United States*, 663 F.2d 82, 88, 229

Ct.Cl. 47, 57 (1981). Plaintiffs do not seriously contend otherwise.[7]

Plaintiffs, however, dispute the Board's determination that the ODS operators, plaintiffs, must have incurred the fuel costs themselves before their eligibility for ODS payment arises. Plaintiffs maintain it is immaterial that it incurred no fuel costs. All that they are required to establish, plaintiffs argue, is that their subsidized steam powered vessels utilized more fuel in their operations than did like foreign diesel powered vessels and thus rendered them less competitive. The fact that plaintiffs did not incur fuel costs and that the burden of fuel cost disparities were assumed and incurred by their charters is, plaintiffs argue, irrelevant.

The Board determined that for ODS operators to be eligible for subsidy, they must incur the costs for which they seek subsidy. The Board found support for its interpretation of section 603(b) in the legislative history of the Act. This history, the Board noted, clearly indicated that the ODS program was not intended to provide the operator with a source of profit but rather was intended to equalize the costs incurred in the operation of an American-flag vessel with the costs of a foreign-flag vessel. The Senate Commerce Committee Report on the Merchant Marine Act of 1936, S.Rep. No. 1721, 74th Cong., 2nd Sess. 7 (1936), states in pertinent part:

> The operating differential is paid to the *ship operator*. The amount of this so-called operating subsidy is primarily limited to a *repayment* of sums of money which *he* has already *disbursed* ... The *repayment* or *reimbursement* to the operator of the excess cost is not, therefore, in any sense of the word, a subsidy. It is merely an equalization of his American costs as against the costs of foreign-flag operation. *There can be no profits to the ship operator* in the repayment *to him* of these out-of-pocket excess expenses which *he has already incurred* .... (emphasis supplied)

The Board's conclusion, in this regard, is a legal one. As such, this legal conclusion is not binding on the court. *See Farrell Lines, Inc. v. United States*, 204 Ct.Cl. 482, 496, 499 F.2d 587, 596 (1974). The court, of course, must give substantial deference to the Board's interpretation of the Act since it has been charged by Congress with its administration. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 800, 13 L.Ed.2d 616 (1965), *reh'g denied*, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965); *United States v. Clark*, 454 U.S. 555, 562, 102 S.Ct. 805, 810, 70 L.Ed.2d 768 (1982); *American Maritime Ass'n*, 766 F.2d at 560. This is especially true in this case since Congress has conferred broad discretion on MarAd in maritime matters such as is involved in these cases. This discretion should not be set aside unless manifestly unreasonable. *Aeron Marine*, 695 F.2d at 574. It was not manifestly unreasonable for MarAd to require, in order to be eligible for subsidy payment, that the one who seeks a subsidy payment for fuel costs must have incurred those fuel costs. The Act, by its language and the Act's legislative history, supports this interpretation, as does common sense. At the very least, the Board's conclusion is based on a permissible construction of the Act and is otherwise reasonable and therefore passes judicial muster. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984).

The Board noted that plaintiffs cited no case law, legislative history, or other precedent rebutting the conclusion that a cost must be incurred by the ODS operator itself in order to be eligible for subsidy. The Board also noted that while numerous cases have addressed issues relating to what items of expenses are properly subsidizable, it was unable to find a single case in which a party has advocated, much less one in which the Board has accepted, the

---

7. Since the ODS agreements in issue, with the exception of the Aeron ODS agreements, do not specifically provide for fuel cost subsidy, any right plaintiffs may have to fuel cost subsidies must, of necessity, be found in the language of section 603(b).

proposition that a subsidy be paid for costs the party itself had not incurred.[8]

Plaintiffs argue there are Board precedents for paying fuel cost subsidies to parties. Plaintiffs cite to the ODS agreement with Aeron, wherein MarAd agreed to pay fuel costs for a limited time and conditionally for a propulsion system power plant for vessels involved in the instant cases, *i.e.*, Golden Dolphin and Golden Endeavor. However, this is hardly precedent for the issue at hand, for the Board denied fuel cost subsidy for these two ships because the charterer, not the vessel owner, paid the fuel cost. The record supports the conclusion that the Board has never paid ODS to an operator unless the operator has incurred the cost for which subsidy is sought.

Again, plaintiffs refer to situations where the Board has paid subsidy on costs of wages, etc., which costs were paid initially by the charterer. It is clear that these payments by the charterer were advances to or resulted from other payment arrangements with the owners of vessel but that the ultimate burden of those expenses rested on the owners, *i.e.*, all portions of those costs were paid ultimately by the owners, not the charterers. As a result, this is a very weak precedent, if indeed it is one. In any event, even if by inadvertence or otherwise, such costs were not incurred by the owner of the vessel but were paid by the charterer, said costs should not have been subsidized. Finally, plaintiffs cite to the Russian grain program where regulations provided for payment of fuel subsidies on vessels approved for the Russian grain program. Plaintiffs allege that these regulations also provided for payment of subsidies on other expenses incurred or paid by parties other than the owners of the vessel, *e.g.*, interest and depreciation costs on leased vessels. The Board noted the unique nature of these expenses and properly found them not to be analogous to the fuel costs in issue. Plaintiffs cannot cite any regulation which allows for the recovery of the subsidy costs sought by plaintiffs herein. Moreover, the Board found that each operator who received subsidy under the Russian grain program did incur the expenses for which subsidy was paid. Plaintiffs' "precedents" are weak reeds for the proposition that subsidy be paid to owners for costs they did not incur.[9]

In denying plaintiffs' exceptions to the ALJ's initial determination, the Board concluded that the applicants had failed to

---

**8.** Plaintiffs' attempt to denigrate the Board's conclusion in this regard by claiming that it was merely an after thought following the court's remand decision is unavailing. The fact is that the issue now before the court was not before the court when it issued its remand decision. Indeed, the court at that time was unaware of the fact that the plaintiffs had not paid for the fuel costs for which subsidy was being sought. Further, there was no need for the Board to discuss the matter prior to that time since it was of the view that plaintiffs were not entitled to fuel cost subsidy because it was not so provided in the ODS agreements. The court in its remand decision rejected this view as too narrow since the discretionary language in the Act could serve as a basis for subsidy if subsidy were otherwise appropriate and justified. *See in this regard Farrell Lines, Inc. v. United States,* 204 Ct.Cl. 482, 496–98, 499 F.2d 587, 596–98 (1974).

**9.** Plaintiffs' other arguments are likewise unpersuasive. Plaintiffs argue that had they known initially that fuel cost subsidies would be available, the charter agreements would have been written to provide that plaintiffs would reimburse the charterers by the amount of fuel cost subsidy they received from MarAd. Hindsight does nothing to support plaintiffs' position. Again, plaintiffs note that the charters of some seven vessels provided that the charters' payment would be net of actual ODS received by plaintiffs. Thus any subsidy paid, plaintiffs argue, would be subject to being passed through to the charterers. The rub here is that plaintiffs are suing on their own behalf for subsidy. They are not suing on behalf of the charterer. This argument does serve to emphasize the fact that plaintiffs did not and will not incur any fuel cost expense. The record indicates that the plaintiffs under their charter have no obligation to reimburse the charterer to the extent of any fuel subsidy payment received. Indeed, the owner of the Kurz Group of five vessels stated in his testimony before the Board that if there was a subsidy recovery in this case he would not turn over the money to any charterer but would "keep the money." Rec.V. of 48, Tr. 177. He further testified that the subsidy he seeks in the law suit would be necessary to keep his five vessels afloat after the long-term charters they were operating under expired. *Id.* at Tr. 173.

meet their burden of persuading MarAd that payment of fuel subsidy to them would be in the public interest. Section 606(1) of the Act makes the award of subsidies contingent on whether the Secretary determines that the subsidies are "fair and reasonable and in the public interest." This is criteria that rests on the expertise and reasoned judgment of the Board. It bespeaks the use of reasonable discretion. As the Board explained, it has discretion to grant subsidies if that aid will further the purposes and policies of the Act. *See* 46 U.S.C.App. § 1117. The purpose, as stated in Section 603(b) of the Act, is "to make the cost of operating such vessel competitive with the cost of operating similar vessels under the registry of a foreign country." In determining whether the fuel subsidy was necessary to make plaintiffs' vessels competitive, the ALJ made several findings. First, it found that plaintiffs did not actually pay for fuel. Therefore, granting a fuel subsidy would not be fair and reasonable. Rather, such a subsidy would amount to a windfall to plaintiffs and be contrary to the public interest. Secondly, plaintiffs did not submit any evidence, despite their claim to the contrary, showing that a specific time charter rate was lower because the time charterer had taken on the cost of supplying fuel. It was reasonable for the ALJ to conclude under these circumstances that plaintiffs did not suffer such a loss because of a fuel cost disparity.

The totality of the record in this case as discussed in pertinent part in the Facts sections of this opinion clearly shows that it would not be fair and reasonable nor in the public interest to award plaintiffs fuel cost subsidies for voyage during the period 1973–1987. This was the finding of the Board, and plaintiffs have not shown this finding to be arbitrary, unreasonable or an abuse of discretion.[10]

### 2. *Post-charter voyage claims*

By 1992, the time charters of nine of the vessels in issue were not in existence. One

of these vessels sank in 1982. The time charter of two other vessels would have expired in 1986, but the vessels were sold to the Navy in 1984 and 1985. One vessel's time charter expired in 1991 (American Heritage), and one other vessel's time charter expired in 1990 (Chelsea). As to the other four vessels in issue, the time charters expired in 1986 (Chestnut Hill), 1987 (Kittanning), 1988 (Coronado), and 1989 (Cherry Valley). While under these charters, the plaintiffs did not incur fuel costs which would be eligible for subsidy. The definite claim period herein is 1974–1987. For the period subsequent to 1987, the record fails to establish plaintiffs' entitlement to fuel cost subsidy on any vessel in issue, and the Board found no such entitlement.

As can be seen from the above discussion only two of the charters expired before the end of 1987, *i.e.,* the charters for the vessels Chestnut Hill and Kittanning. The record indicates that after the Chestnut Hill charter expired in 1986, the vessel was thereafter engaged for the most part in the preference trade. While so engaged the vessel was not entitled to subsidy payments. The Kittanning charter expired in 1987. This vessel, like the Chestnut Hill, was likewise thereafter engaged for the most part in the preference trade. The Coronado charter expired in 1988, the Cherry Valley charter expired in 1989, and the Chelsea charter expired in 1990. The record indicates these vessels were thereafter engaged in the preference trade for the most part. The American Heritage charter expired in 1991. There is no indication in this regard as to the employment history of this vessel subsequent to 1991.

Plaintiffs aver that subsequent to 1987, the expiration of the time charters of the above vessels, these vessels operated in the spot market for single voyage cargos in the preference trades and occasionally

---

**10.** The Board also noted that to grant plaintiffs' retroactive readjustment of subsidy for prior years would not be in the public interest and would not make plaintiffs' vessels competitive with foreign vessels for those years. Indeed, there was evidence in the record that plaintiffs would use any fuel subsidies granted for purposes other than to make the vessels competitive vis-a-vis similar foreign vessels.

were able to compete with foreign ships on return voyages for cargos secured in the commercial trade. Plaintiffs contend that they paid all fuel costs for the operation of the vessels during the period subsequent to 1985 for these designated vessels. It is to be noted that the vessels are not entitled to subsidy while engaged in the preference trade, since they are insulated from competition from foreign ships while so engaged.

 Plaintiffs argue that, without more, they are entitled to fuel subsidy payments for these vessels because these vessels were steam powered and thus consumed more fuel than like foreign-flag vessels. This fact, they argue, made them less competitive. This is a most over simplified view of a complex and complicated Maritime problem.

On this record, there is no basis for the court to conclude that plaintiffs are entitled to fuel cost subsidy for these designated vessels subsequent to 1987. Plaintiffs concede the record does not contain details for any subsidy calculation in this regard.

While plaintiffs believe they are entitled to subsidy solely on the ground that steam powered vessels consume more fuel than diesel powered vessels, the record suggests other factors also played a role in the ability of ships in general to compete. The Merchant Marine Act of 1936 provided for subsidies for the operation of American-flag vessels, and this fact did not serve to deter the decaying American Merchant Marine. The economics involved for the period 1970–1980 were discussed in the facts section of this opinion. Those facts caution against concluding, without more specifics than plaintiffs provide herein, that fuel cost disparity alone was sufficient to justify fuel cost subsidy for plaintiffs' vessels subsequent to 1985.

This much seems true, plaintiffs' vessels seem to have been employed most of the time subsequent to 1987. Also, the various operators, owners and/or charterers of vessels engaged in various strategies to lessen

the effect of changing times and to meet the challenge of competition.[11]

The matter of competition, in the long run, is really within the expertise of the Board. The discretionary power of the Board to determine when the fuel cost factor is such that the competition negative of American-flag vessels operations needs the infusion of fuel cost subsidies to eliminate this negative cannot be ignored. The court, under such circumstances, cannot substitute its judgment for that of the Board. On the other hand, the Board's discretionary authority cannot be abused nor can it be exercised in an arbitrary or capricious manner.

The Board refused to find that plaintiffs' vessels were unable to compete generally with foreign-flag vessels. Plaintiffs' arguments here, as they were before the Board, are that these vessels are at a disadvantage vis-a-vis foreign-flag with regard to the particular expense of fuel.

Plaintiffs argue that if the Board had acknowledged its obligation to adjust subsidies in the future to make fuel and other costs competitive, plaintiffs would have been able to compete. This argument fails first and foremost because the Board is not obligated to grant fuel subsidies to plaintiffs. It is entirely within the Board's discretion. Furthermore, factors other than fuel costs affected the competitiveness of the ships. Such factors include the age of the vessels, the large number of vessels of this kind available, and changes in the shipping industry.

The Board noted that the evidence does not address the critical question of whether their vessels generally cannot compete. The Board concluded that plaintiffs have failed to persuade the Board, in any event, that the public interest would be served by granting them fuel cost subsidies under these circumstances of the record. It is worth pointing out again that the Board has authority to grant readjustments when it is *"fair and reasonable and in the pub-*

---

**11.** One of the strategies employed by American-Flag vessels was to engage in "slow steaming" to conserve fuel. As indicated previously, diesel powered vessels were also slow steamers.

While it may well be that under such circumstances the diesel powered vessel still used less fuel than its American counterpart, the fuel cost disparity may have been lessened.

*lic interest."* The totality of the record supports the Board's finding. In this regard, the Board noted the testimony of one of plaintiffs' experts that plaintiffs would have to offer a lower charter rate in order to obtain employment to offset their vessels' higher fuel costs. This is not necessarily true. As indicated previously, there is no evidence in the record that the time charterers of plaintiffs' vessels obtained lower charter rates because they assumed the cost of paying for fuel. The Board further observed, in any event, that the expert did not examine whether plaintiffs might have other advantages, such as reduced capital costs or resort to carriage of preference cargo which might allow plaintiffs to offer a lower charter rate and thus compete regardless of the fuel expense disadvantage. It is noted that the Board did find that the fuel expenses disadvantage, with a properly documented and justified claim showing that plaintiffs did, in fact, incur fuel costs and that payment of fuel cost subsidy would be fair, reasonable, and in the public interest, could be approved by the Board.[12] As explained previously, plaintiffs' position is that merely because a fuel cost disadvantage existed between American and foreign ships, they are entitled to subsidy payments. This is just not so. As observed in *American President Lines, Ltd. v. Federal Maritime Board,* 112 F.Supp. 346, 348 (D.D.C.1953), "it is not mandatory for the Board to grant a subsidy merely because the applicant complies with specified conditions. It must consider and weigh many aspects of public policy and expedience in reaching a conclusion." The allowance of subsidy payments is committed by law to agency discretion. On this record, the court cannot find an abuse of discretion or arbitrary or capricious action by the Board in refusing to grant post-charter fuel subsidy claims.

### 3. *Particularized vessel claims or Aeron contract claims*

When the Aeron Marine Shipping Company was negotiating with MarAd for subsidy contracts in 1972, foreign-flag vessel charter rates had fallen. Aeron, as a result, doubted whether competitive rates vis-a-vis the foreign-flag charter rates, would produce enough revenue to cover the operating costs of the two vessels to be constructed, Golden Dolphin and Golden Endeavor. Taking into account the lower foreign-flag charter rates, Aeron believed it would have to accept about $2.23 d.w.t. a month charter hire, as compared with $2.65 d.w.t. a month for foreign-flag charter hire. Aeron felt that $2.32 d.w.t. a month might not produce enough revenue to cover costs and thus this difference in charter hire might prove critical to the financial success of the three vessels in question. The charterers' views on these negotiations are not set forth by plaintiffs.[13]

The two vessels in question were to be powered by a propulsion system which ostensibly consumed more fuel in vessel operation than was the case with standard steam engine vessels. Aeron and MarAd

---

**12.** Plaintiffs complain because the Board was not persuaded by plaintiffs' evidence designed to show that if fuel cost subsidies were available to them in the early 1970s and thereafter, such subsidies would have been used, either by the plaintiffs or the charterers, to make the vessels competitive. Such speculative hindsight carries little weight. There were other economic factors besides fuel cost disparity at work during the period at issue which affected Maritime shipping. Too, plaintiffs' vessels, as the Board found, fared quite well during this troubling economic period both in terms of employment and profit. Plaintiffs' vessels had available to them the preference trade option which sheltered them in really tough periods from foreign competition.

**13.** It is interesting to note that plaintiffs made no effort to negotiate an ODS for fuel costs with

MarAd prior to entering into ODSAs with MarAd relative to most of the vessels. Presumably this was because fuel costs were to be paid by the charterers and thus of no concern to plaintiffs. In the case of the Golden Dolphin and Golden Endeavor, fuel subsidy was negotiated for a limited time and under certain conditions. The point is that plaintiffs must have been aware of the fact that fuel cost subsidy may be available if they could justify and document its need. There is no evidence in the record that at the time these particular ODSA were reached, MarAd was aware that the charterers were going to pay the fuel costs of these vessels. Had MarAd known this fact, it is reasonable to assume MarAd would not have agreed to subsidize costs not incurred by the vessel owner.

negotiated an ODSA wherein, *inter alia*, subsidy would be paid to cover the difference between the costs of fuel of the two ships named above and the costs of fuel of competitive foreign ships unless Aeron could charter the two vessels at a rate exceeding $2.67 d.w.t. a month. It would appear that the world market rate for similar vessels at or about this time was $2.65 d.w.t. a month.

The ODSA covering these vessels specifically provided that the fuel cost subsidy would only be available for seven years commencing with the operation of the vessels under the vessels time charter. Further, no fuel cost subsidy would be available during this seven year period when the charter hire on the subsidized vessels exceeded $2.67 d.w.t. a month.

Aeron chartered the Golden Dolphin and Golden Endeavor for seven-year terms at rates of $2.55 d.w.t. a month, beginning October 10, 1974 (Golden Dolphin) and December 13, 1974 (Golden Endeavor). The contract rates were increased to $2.71 d.w.t. a month, effective December 13, 1974, for both vessels. Plaintiffs seek to recover some $1.7 million for fuel cost paid by the charterers of their vessels Golden Dolphin and Golden Endeavor for the years 1975, 1976, and 1977. This claim figure of course, is estimated since, as indicated previously, the charterers refused to provide plaintiffs with any fuel cost data.

The Board denied this claim pointing out that the charter hire rate ($2.71 d.w.t. a month) always exceeded the critical rate set forth in the ODSA of $2.67 d.w.t. a month for the years 1975 and thereafter.[14] Accordingly, the Board concluded that under the terms of the ODSA, plaintiffs were not entitled to fuel cost subsidy. The Board also noted that plaintiffs also were not entitled to fuel cost subsidy because the fuel costs for which subsidy was sought were incurred by and paid by the charterer, not the plaintiffs. During the

hearing, Kurz, a shipowner, admitted that the contracts required an ODS contract holder to incur the cost for the item of expense before he was eligible for subsidy. *See* T. 175–76. The time charter of these two vessels were "hell-or-high water" type charters. That is, the vessels' expenses, including fuel, were paid by the charterers of the vessels whether operating or laid-up, not by plaintiffs.

Plaintiffs utilized the total charterers' payments for the years 1975, 1976, and 1977, and the number of voyage days for those years to arrive at what they called "Effective Charter Hires Rates" for the years 1975, 1976, and 1977. For the Golden Dolphin, the "effective rates" computed by plaintiffs for those years were $2.45, $2.39, and $2.22 d.w.t. a month. For the Golden Endeavor the "effective rates" computed for those years were $2.60, $2.26, and $2.34 d.w.t. a month. Relying on these calculations, plaintiffs claim entitlement to fuel cost subsidy since these effective charter hire rates, computed above, are all less than the ODSA ceiling rate of $2.67 d.w.t. a month.

Section 4 of the charter for these vessels initially required the charterers to pay plaintiffs $2.55 d.w.t. a month for the use of the vessels. This figure was later revised to $2.71 d.w.t. a month. Section 6 of the charter stated that "the aggregate amount of all Hire paid under Section 4 of this time charter during any six (6) month period ... shall not be less than the sum of all basic and supplemental bareboat charter hire, all voyage expenses and all overhead costs, net of subsidy."

Plaintiffs argue that the charter hire figure of $2.71 d.w.t. a month was to be net of ODS. The Board rejected this interpretation of the charter and further noted that no evidence was presented to justify such an interpretation.

---

**14.** At oral argument, plaintiff contended that the Golden Dolphin rate was $2.55 at all times and was not increased to $2.71 in December 1974 as was the Golden Endeavor rate. Such an argument was not readily apparent in plaintiffs' written submissions. The record is confusing on this point. However, the record supports the Board's finding that the rates for both vessels were increased in December 1974 to $2.71. *See* the testimony of Leo V. Berger, Vol. 47, Tr. 32, and Arthur B. Sforza, Vol. 53, Tr. 4998–99.

The Board held that the purpose of section 6 of the charter was to ensure that the charter hire rate in section 4 would be the minimum amount of charter hire. If the charter hire under section 4 was insufficient to cover section 6 costs, the charterer was obligated to make up the difference. However, this event, if it occurred, did not render the $2.71 d.w.t. a month rate inoperative. It was by reference to the section 4 rate that the hire rate in section 6 was to become operative. Accordingly, the charter hire rate set forth in section 4 of the charter when the parties entered into the ODS agreement governed the intent of the parties. When the rate in section 4 of the charter was revised on December 13, 1974, that revised rate served as the bell ringer for entitlement consideration. This is a reasonable and rational interpretation of the charter.

The Board noted that the ODS agreement did not provide that the charter hire rate was to be net of ODS. Plaintiffs find this observation of little moment because, in their view, the parties "recognized" that the charterer would pay charter hire while the Board would pay ODS. No contract language or evidence is cited in support of this argument.

In the last analysis, it seems clear that the intent of the fuel cost subsidy provision in issue was that fuel cost subsidy would be available if the charter hire was below $2.67. Under section 6, the charter hire could never be below $2.71 because it was a guaranteed charter hire figure to plaintiffs. Plaintiffs' arguments to the contrary are unpersuasive. If, in fact, the charterer paid plaintiffs' charter hire less than $2.71, then the charterer violated the terms of the charter and underpaid plaintiffs. That fact does not serve as a basis for giving an unreasonable reading to the charter language.

In any event, plaintiffs are not entitled to fuel cost subsidy on the claim, as indicated previously, because the time charterers paid for the fuel under their time charters. Since plaintiffs did not incur the fuel costs for which they seek subsidy, they are not entitled to any subsidy for such costs. As indicated previously, the vessels Golden Dolphin and Golden Endeavor were operating under "hell-or-high water" charters. This meant that the charterers paid all fuel costs for vessel operations and off-hire periods.

### 4. Off-hire claims

Plaintiffs contend that they are entitled to fuel cost subsidy for periods of time when their vessels were out of service or "off-hire." While the vessels were off-hire, plaintiffs maintain, they were required to pay fuel costs incurred by the vessels. Plaintiffs seek to recover about $1.1 million for fuel costs they allege they incurred while their vessels were off-hire during the period 1977–1986. Eight vessels are involved in this claim (Golden Monarch, Worth, American Heritage, Coronado, Cherry Valley, Chelsea, Chestnut, Chestnut Hill, and Kittanning). The term "off-hire" is used in various contexts in this case. Plaintiffs use the term to cover all periods when the vessel was laid-up for whatever reason. Plaintiffs rarely, if ever, indicate why the vessel was laid-up or in plaintiffs' words "off-hire." A brief discussion of the term "off-hire" is accordingly necessary.

In most time charters, there are provisions which provide that at certain times during the time charter, payment of charter hire ceases and fuel costs, inter alia, are no longer borne by the charterer but must be borne by the vessel owner, plaintiffs herein. These certain times occur when the vessel is "off-hire" or "laid-up" for repairs, accidents, medical emergencies, strikes, and like matters that interfere with the vessels' service availability under the time charter. Another form of "off-hire" is when a vessel goes into dry dock for scheduled maintenance. This event is usually covered in the time charters, and the vessel owner, not the charterer is generally responsible for fuel costs during this dry dock off-hire period.

When a vessel is laid-up for emergency repairs, for example, it is sometimes described as being "laid-up" or "off-hire" since it is out of service. However, the term "laid-up" is also used when the ship is

taken out of service at the option of the charterer under specific "lay-up" provisions of the time charter. When the vessel is laid-up at the charterer's option, charter hire continues, and the charterer's obligation to pay fuel costs continues despite the lay-up. If such a lay-up is termed "off-hire" the consequences are most misleading if a fuel cost claim is made by an owner for a vessel laid-up at the option of the charterer because the charterer would pay said fuel costs. Indeed, plaintiffs have in their findings stated that charterers during the claim period laid-up the vessels on occasions on their own and continued to pay charter hire and fuel cost. Plaintiffs cite to the vessel Golden Monarch, which was laid-up at the charterer's option for a number of quarters during the periods 1975, 1976, 1978, 1979, 1981, 1983, 1984, 1985, and 1986. During these quarters of lay-up, the charterer, not plaintiffs paid the fuel costs. The record suggests that the vessel American Heritage might also have been laid-up at the charterer's option during various periods of time between 1975–1986.

The point of the above discussion is to indicate that the nature of the off-hire has significance in considering a claim for fuel cost subsidy during periods when the vessel is off-hire or laid-up. Further, section 606(2) of the Act requires a reduction of subsidy when a ship is laid-up in certain circumstances, thus requiring some indication of the reason for the lay-up. Plaintiffs are critical of the Board because it faulted plaintiffs for not identifying the type of off-hire for which claim was made. The above brief discussion indicates the Board's criticism of plaintiffs in this regard was justified. Plaintiffs, in their briefs, state there was no reason to analyze the vessels' activity in the off-hire periods. "It is enough [plaintiffs contend] that the vessels were engaged in operations under the subsidy contract and fuel costs were a cost of those operations."

█ It is important to note that six of the fourteen vessels in issue were operating under "hell or high water" charters which required the charterer to pay, *inter alia,* fuel costs while the vessels were off-hire or laid-up. These vessels were the Ultramar, Ultrasea, Golden Dolphin, Golden Endeavor, Beaver State and Rose City. Accordingly, these vessels are outside the pale of this particular claim.

█ The Board concluded that plaintiffs *could* be entitled to fuel subsidies for the off-hire periods at issue if they could establish that they paid the fuel costs during those off-hire periods and that the ships were off-hire for purposes necessary to keep them competitive, *e.g.,* prudence and required maintenance and repairs. Further, a documented claim for appropriate off-hire periods that was fair, reasonable, and in the public interest would most probably be accepted by the Board.

The Board, however, found that the evidence presented by plaintiffs was not sufficient to grant any specific fuel cost subsidy. For the Berger Group of nine vessels, plaintiffs' claim to the Board only showed gross yearly amounts of fuel expenses paid by three Berger companies with no definition of what type of off-hire was involved. For the Kurz Group of five vessels, plaintiffs' claims to the Board only showed gross yearly fuel costs by company, which could not even be tied to specific ships. While the Berger companies involved had only one ship per company, the Kurz companies involved had more than one ship per company. Further, plaintiffs' calculations of subsidy did not identify off-hire claims as such. Plaintiffs did attempt to extrapolate off-hire claims from their broad and general subsidy calculation by the "normal fuel consumption method," but this method was shown to be inaccurate. Plaintiffs suggested that the "hypothetical fuel consumption method" might be appropriate to calculate off-hire subsidy, but MarAd made no attempt to do this since the off-hire periods claimed were not defined.

To sustain a subsidy claim before the Board, plaintiffs were required to submit invoices, cancelled checks, or other verifiable documentation for the agency to ensure that expenses for which subsidy is paid are reasonable and actually incurred by the owner of the vessel. Plaintiffs presented no such documentation. The evidence

plaintiffs did present was a summary compilation of yearly off-hire fuel costs either paid or to the account of the specific plaintiffs involved.

As indicated above, plaintiffs contend they do not have to set forth the purpose or reason for the off-hire or lay-up period. The Board cited, in response, MarAd regulations, 46 C.F.R. 252.20(a)(4)(i) (1975) (amended 1986), wherein subsidized owners are required to report promptly any lay-up period occurring during or between voyages "and the facts and circumstances relating to such period." This requirement would have to be followed before fuel subsidy could be granted for lay-up periods where the owner incurred the cost of fuel. The Board also noted deficiencies in the claim calculations submitted by plaintiffs and the financial reports filed by plaintiffs to MarAd, which rendered the calculations presented by plaintiffs questionable and thus unpersuasive. The Board further remarked that plaintiffs failed to demonstrate, as required by regulations that the fuel was purchased in the United States, or that it was delivered outside the United States by domestic suppliers.[15] There is no legal or factual basis to disregard the Board's denial of this claim.

### 5. *Russian grain claim*

■ In 1972, the United States and the U.S.S.R. entered into a Maritime agreement whereby part of the grain exports from the United States to the U.S.S.R. was reserved for American-flag vessels. Under this agreement, there was established a Russian grain program. *See* 23 U.S.T. § 3573. This program was designed to induce operators of laid-up American-flag vessels into carrying cargo by shielding these vessels from losses in a depressed market. MarAd issued regulations in 1973, which set up, *inter alia*, a program to subsidize bulk vessels engaged in carrying bulk raw and processed agricultural commodities from the United States to U.S.S.R. 46 C.F.R. § 294 (1973). Under these regulations, short-term ODS agreements were granted which provided subsidy for items not subsidized by the normal long-term ODS agreements. Among the additional subsidizable items included in the Russian grain ODS agreements, relevant herein, was fuel. Other items included were depreciation and interest.

The Russian grain program was a preference trade program and, as such, insulated American-flag vessels from competition from foreign-flag vessels. Short-term subsidy contracts limited to the Russian grain trade were available for some 88 vessels which were required to apply for and meet regulatory criteria. All bulk operators under long-term ODS agreements, for example, were required to obtain approval of the Board to participate in this program.

Plaintiffs applied for and obtained approval for twenty voyages by six of their vessels. Plaintiffs received their regular subsidies for these voyages but were refused fuel subsidies. As indicated above, the Russian grain program regulations listed fuel as an item subject to subsidy consideration. Thereafter, plaintiffs sought to obtain fuel cost subsidy payments from the Board for twenty voyages. The Board denied this claim. Plaintiffs seek to recover some $4.3 million for charterer paid fuel cost covering the period 1975–1979 for seven vessels (Ultramar, Ultrasea, Golden Dolphin, Golden Endeavor, Golden Monarch, Coronado, and Cherry Valley).

The Board noted that plaintiffs were not covered by the subsidy provisions under the Russian grain regulations, 46 C.F.R. § 294, because these voyages were conducted under their existing long-term ODS agreements.[16] Viewed in this fashion,

---

**15.** The Board also noted that the amount plaintiffs requested for off-hire subsidy, about $1.1 million, was somewhat insignificant when it is considered that it embraced subsidy for some eight vessels over a ten-year period and would have impacted negligibly on the vessels' competitiveness. While plaintiffs concede the amount claimed is small in this context, and standing

alone not a competitive factor, they do not view the claim amount itself as trivial.

**16.** As indicated above, the Russian grain program was intended to induce operators of laid-up American-flag vessels to carry agricultural commodities to the U.S.S.R. and to shield them from losses in a depressed market. Initially,

plaintiffs' request for fuel cost subsidies was in essence a request for readjustment of ODS under their long-term ODS contracts.

The Board denied plaintiffs' claim for fuel cost subsidies for voyages under the Russian grain program because the fuel costs for which they sought subsidies were paid by the charterers of the vessels and not by the plaintiffs. Plaintiffs contend this fact is immaterial. Plaintiffs assert that under the regulations applicable to the Russian grain program, fuel was listed as a subsidizable item and thus plaintiffs were, without more, automatically entitled to fuel cost subsidies. Plaintiffs argue that the regulations gave them a contract right to recover fuel cost subsidies. The contract, plaintiffs argue, came about when plaintiffs applied for and received MarAd approval to participate in the Russian grain program.

Plaintiffs claim that their long-term subsidy contracts allowed them to elect to be paid ODS in accordance with regulations of general applicability relating to payment of ODS which differ from the provisions contained in their long-term subsidy contracts. In their long-term subsidy contracts fuel costs were not listed as a subsidy item. Under the Russian grain program fuel cost was listed as a subsidy item. Plaintiffs argue that they could, and do, elect to receive fuel cost subsidies under the Russian grain subsidy regulations. First, it is noted the regulations relied on must be of "general applicability." The regulations at issue were not of general applicability but were directed specifically at the Russian grain program. Even if one accepts plaintiffs' argument at face value, it does not add merit to their contention, for the Russian grain regulations, as noted by the Board, required Russian grain subsidy seekers to provide proof that they did incur

certain expenses, specifically fuel. 46 C.F.R. 294.14(b)(ii)(D) (1973). As is clearly established herein, plaintiffs, themselves, did not incur fuel costs during the twenty voyages of their vessels under the Russian grain program and did not submit evidence of fuel consumption and costs. The charterers of their vessels incurred and paid for these fuel costs. Moreover, participation in the Russian grain trade meant insulation from foreign-flag competition because said trade was a preference trade. Since the fact of foreign-flag competition was absent, there is no basis, in any event, for plaintiffs to recover fuel subsidies for those twenty voyages in issue.

## V. Damages

■ The Board found serious deficiencies in the evidence proffered by plaintiffs at the hearing on quantum, *i.e.*, the amount of subsidy claimed by plaintiffs.

Plaintiffs were unable to produce before the Board the actual costs of fuel consumed by each vessel or the actual amount of fuel consumed by each vessel under their time charters. This was so because the charterers paid for the fuel utilized in the operation of the vessels, and thus the data in this regard was within the charterers' control. Plaintiffs claim they were unable to obtain such data because the charterers ostensibly considered it proprietary data and would not release it.

Under the regulations, it seems clear that for a subsidy to be paid, such a payment must be based on actual audited costs. MarAd generally determines whether subsidy payments are proper through detailed audits which entail inspection by MarAd of invoices and cancelled checks to insure that expenses for which subsidies are paid are reasonable in amount and are for expenses actually incurred in subsidized vessel operations. Plaintiffs presented no

vessels under long-term ODS contracts were not allowed in the Russian grain trade. By 1975, however, vessels under long-term ODS agreements were allowed to carry Russian grain cargos but only with ODS as contained in their long-term ODS contracts pursuant to the regulations, 46 C.F.R. § 252 (1975). Subsidy levels under the Russian grain ODS contracts were higher than those provided under the long term

ODS contracts. However, an abatement of subsidy under the plaintiffs' long-term ODS contract was required if the carrier received a freight rate higher than the break-even freight rate set forth in the governing regulations. In recognition of the lower subsidy rate for vessels under long-term ODS contracts, the Board provided for separate abatement rates for vessels receiving ODS pursuant to 46 C.F.R. § 252.

such documentation in their request for fuel cost subsidy.

Lacking actual fuel cost data, plaintiffs utilized Bunker C fuel prices based on information from the Port of New York. Plaintiffs felt this would provide representative data for fuel cost determinations. However, the record makes it clear that the history of voyages of the fourteen vessels in issue during the claim period show that the vessels most probably obtained Bunker C fuel at a variety of ports other than New York and no details were provided by plaintiffs as to those purchases. The Board felt that the prices paid for the fuel burned on the voyages for which subsidy was sought was a necessary element in the comparison that must be made with the fuel costs of similar foreign-flag vessels in order to establish the amount of any fuel subsidy.

Again, fuel is generally purchased on a negotiated basis at a particular port where fuel is to be supplied. It must be noted that major oil companies, some of which were the time charterers of plaintiffs' vessels, were suppliers as well as consumers of Bunker C fuel. Oil companies may well prefer to supply Bunker C to vessels under their control or arrange an in-kind exchange of bunkers with another oil company to meet the needs of these vessels at different worldwide ports. Accordingly, the fuel costs to these oil companies of in-house or exchange bunkering is most probably not represented by "posted" or published estimated fuel price levels at the Port of New York. Further, when oil companies do purchase fuel for a chartered vessel, they are most likely to obtain discounts for large volume purchases and for being creditworthy customers, particularly where the chartering company is buying from the parent company. Plaintiffs' cost expert conceded that neither his cost exhibit nor other published composite price indicators would identify the actual price paid in a particular fuel purchase transaction in a volatile market where prices vary by port from week to week and day to day. As plaintiffs' expert noted, the price of fuel fluctuated daily, during the claim period, even hourly, depending on the inquiry, the customer, and the market conditions. The expert concluded that his cost data was only an informed indicator of historical bunker price levels in New York. He could not identify any particular fuel purchase with any vessel in issue.[17]

Plaintiffs presented three methods as a possible means of arriving at a fuel subsidy differential, between a steam vessel (American) and a diesel vessel (foreign). Plaintiffs advanced these three methods at the hearing, but their calculations and testimonial presentations relative thereto were found to be unpersuasive by the Administrative Law Judge (ALJ) whose findings in this regard were adopted by the Board.[18]

The Board noted that plaintiffs had failed to carry their burden of showing that their fuel cost calculations were reasonably accurate and possessed of reasonable specificity. The Board felt that the prices paid for the fuel burned on the various voyages was a necessary element in the comparison that must be made with the fuel costs of similar foreign-flag ships to establish the amount of fuel subsidy.

Plaintiffs did not present the actual cost of fuel burned on voyages for which they claimed subsidy. Instead they used Port of

17. The Board noted that the ODS contracts with plaintiffs required them to demonstrate that costs for supplies, etc., for which plaintiffs sought subsidy, were purchased in the United States or delivered outside the United States by domestic suppliers. Plaintiffs have not made any such demonstration relative to the fuel costs for which they seek subsidy payments.

18. The Administrative Law Judge (ALJ) analyzed and critiqued these methods and the fuel subsidy calculations by plaintiffs' experts and found them lacking. The ALJ noted that the hypothetical fuel consumption method, the only option fully explained and sponsored in plaintiffs' evidence, was discarded on brief because it produced about one-half of the subsidy allegedly due compared to the other two methods: the normal fuel consumption method and the actual fuel consumption method. There was no actual fuel consumption expenses data available for any of the fourteen vessels in issue. As to the normal fuel consumption method, a fictional daily fuel cost calculation was achieved which was twice the figure reached in those instances where actual fuel consumption data was available.

New York Bunker C fuel costs. The record supports the view that use of these historical price figures was not, under the circumstances of these cases, sufficiently reliable data on which to premise a subsidy award, especially when audited costs or some documentation of costs relating to each vessel for which subsidy is sought was required.

As to the methods utilized by plaintiffs to calculate the subsidy amounts plaintiffs claimed, there was controversy and conflicting testimony over which method might be appropriate. These methods were examined by the ALJ, discussed in his initial decision, and found to be flawed. The Board adopted the ALJ's finding that plaintiffs failed to meet their burden of proof with regard to establishing the amount of any of their subsidy claims. Plaintiffs concede, as they must, that their subsidy claim calculations are not based on actual fuel costs incurred by each vessel during the claim period. Fuel costs for which subsidy is sought were unaudited and undocumented.[19]

Plaintiffs charge that under Board practice, actual costs are not essential and are not necessary for determining the amount of subsidy.[20] On a voyage by voyage analysis, there indeed may be times when the absence of actual costs may not be fatal to a subsidy recovery. On the other hand, allowing subsidy claims for fourteen vessels over some thirteen or fourteen years of voyages based on historical cost data

which is far from representative of what one would reasonably expect the actual costs to be is something else. The Board's demand for actual costs under the circumstances of this case is not deemed arbitrary, capricious, or an abuse of discretion when the historical data designed to replace actual costs fails to engender a feeling that such costs are truly representative of all the voyages taken during a thirteen-year period.

■ Plaintiffs utilized experts to calculate the amounts they sought as subsidy payments. Plaintiffs believed that since this evidence was accepted at the hearing without objection, it must be given more weight than would be the case if it were received in evidence over objection. The fact of the matter is that the ALJ and the Board found the presentations of these experts to be unpersuasive. The totality of the record fails to show that such a view by the ALJ and the Board is arbitrary, capricious, or an abuse of discretion. In any event, the Board was not required to accept plaintiffs' evidence *in toto*. Indeed, uncontradicted opinion testimony is not conclusive, if it is intrinsically unpersuasive. *Sternberger v. United States*, 185 Ct.Cl. 528, 535–36, 401 F.2d 1012, 1016 (1968).

■ Plaintiffs lament that the record does not admit of a rational finding that plaintiffs' appropriate fuel subsidy rate was zero. However, the Board found that plaintiffs had failed to prove the amount of

---

**19.** Plaintiffs fault the Board in this regard for not telling them in early 1970 that fuel costs were subsidizable expenses. Yet, plaintiffs, if they intended to pursue a subsidy claim, had an obligation to keep records of costs for which they might seek subsidy. The Board did not view fuel costs as a standard subsidizable expense in 1970 and thereafter, since such an expense was not so listed in the Act or in ODS agreements as a subsidized cost. However, such costs could be negotiated as part of an ODSA. *See* note 10, *supra*. Plaintiffs could have and should have documented their fuel costs during the claim period if they intended later to claim these costs as entitled to subsidy payment. At the very least, plaintiff should have documented the fuel costs for its Aeron Marine claim where fuel costs were conditionally available as a subsidy item with regard to two vessels.

**20.** Plaintiffs misread the Board's practice. In truth, the Board would rather have actual costs for subsidy determination, but actual costs sometimes understate or overstate situations. For example, plaintiffs cite wage costs as an example of the Board not being bound by actual costs. However, in those instances, the Board perhaps would find the actual costs incurred by the owner to be excessive and thus the Board would have to determine a reasonable wage cost by some method. But, the actual cost served as a basis for the Board to make such determination. In the cases at bar, the absence of actual costs—given the volatile nature of the oil market, changing Maritime trade routes, etc.,—produces uncertainty, speculation, and the potential for subsidy abuse if recourse is made to various reconstruction methods to see which produced the highest subsidy payment.

subsidy they might be entitled to receive. The Board noted that plaintiffs, with a documented and appropriate presentation, might well be entitled to some subsidy payments. It is not unusual for one to be entitled to recover on a claim but fail to do so because of a failure of proof on quantum. *See Joseph Pickard's Sons Co. v. United States,* 209 Ct.Cl. 643, 532 F.2d 739 (1976).

### VI. *De Novo* Proceedings

Plaintiffs suggest that because of the Board's bias and procedural short comings, the court should address this litigation without the inhibitions that usually are prescribed as a standard of review of agency determinations. The court has previously rejected plaintiffs' charges of bias and procedural deficiencies leveled at the Board. Accordingly, no basis exists for *de novo* review of the Board's determinations on those grounds.

Plaintiffs, however, ask for *de novo* actions by the court in any further proceedings in this case whether on liability or damages. Plaintiffs, in particular, request that the court determine *de novo,* on the basis of the existing administrative record, the amount of fuel subsidy due plaintiffs.

 The prevailing view is that where subsidy rates are concerned, the amount of subsidy should be determined by the Board in the first instance. *Oceanic S.S. Co. v. United States,* 218 Ct.Cl. 87, 121–23, 586 F.2d 774, 793–94 (1978). This court, like other courts do not have the expertise, or the authority, to determine what subsidy rates should have been established. *Id.* The *Oceanic S.S. Co.* holding effectively disposes of plaintiffs' arguments in favor of *de novo* establishment of subsidy rates by the court.[21]

21. Plaintiffs argue that all the evidence necessary to set subsidy rates is in the record. This evidence consists of plaintiffs' rate calculations which have been shown to be subject to conflicting views and disputed methods of computations resting on the unsteady pilings of historic New York City Port Bunker C fuel rates. The court has examined the administrative record in these cases with particular reference to the sub-

### CONCLUSION

Having reviewed the submissions of the parties, participated in oral argument, and reviewed the administrative record, the court grants defendant's cross-motion for summary judgment and denies plaintiffs' motion for summary judgment. The Clerk is directed to enter judgment dismissing the complaints. No costs.

mission of the parties. The court, after consideration of the record, states, with no hesitation, that rate-setting should be a function of the Board since the Board has not only the authority, but the expertise to handle this complex and difficult discretionary task imposed on the Board by Congress. *See Aeron Marine,* 10 Cl.Ct. at 251.